UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SMOTHERED COVERED, L.L.C.                          CIVIL ACTION

VERSUS                                            NO. 22-5132

WH CAPITAL, L.L.C., *et al.*                       SECTION M (5)

### FINDINGS OF FACTS & CONCLUSIONS OF LAW

This is a case involving claims for breach of contract, fraud, and violations of the Louisiana Unfair Trade Practices Act ("LUTPA") related to the sale of a decommissioned Waffle House restaurant building. Plaintiff Smothered Covered, L.L.C. ("Smothered Covered") filed this suit against defendants WH Capital, LLC ("WH Capital") and Waffle House, Inc. ("Waffle House") (together, "Defendants"), alleging that Defendants breached the sales agreement related to the real property by removing, before the sale, certain items that Smothered Covered asserts were component parts of the building. Smothered Covered also alleges that the circumstances surrounding Defendants' removal of those items constitute fraud and a violation of LUTPA.

This matter was tried before the Court, sitting without a jury, over five days. Having considered the evidence admitted at trial, the arguments of counsel, post-trial submissions, and the applicable law, the Court issues its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent a finding of fact constitutes a conclusion of law, the Court adopts it as such, and vice versa.

**FINDINGS OF FACT**

I.    **JURISDICTION**

1.    This Court has diversity subject-matter jurisdiction over the claims in the complaint under 28 U.S.C. § 1332.  The citizenship of plaintiff Smothered Covered (Louisiana) is completely diverse from that of defendants WH Capital and Waffle House (Georgia), and the amount in controversy between the parties exceeds $75,000.

2.    Venue is appropriate in the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b), because a substantial part of the events giving rise to the claims occurred within the district.

II.    **THE PARTIES**

3.    Smothered Covered is a limited liability company formed on March 10, 2022, under Louisiana law for the purpose of purchasing and owning the property at issue in this litigation.[1]   The members of Smothered Covered are Casey Burka, Ben Jacobson, Aaron Kazanoff, and John Ivy Mouledoux, all of whom were citizens of Louisiana when Defendants removed this lawsuit to this Court.[2]   Jacobson is the managing member of Smothered Covered.[3]

4.    WH Capital is a limited liability company formed under Georgia law.[4]   Waffle House is the only member of WH Capital.[5]

5.    Waffle House is a corporation formed under Georgia law that maintains its principal place of business in Georgia.[6]

---

[1] R. Doc. 151 at 12; Ex. 140; Testimony of Ben Jacobson and Aaron Kazanoff.
[2] R. Docs. 151 at 13; 161; Exs. 84, 140; Testimony of Jacobson and Kazanoff.
[3] R. Doc. 151 at 13; Ex. 140; Testimony of Jacobson.
[4] R. Doc. 1 at 4.
[5] Id.
[6] Id.

6.      At the relevant times, Waffle House's operational hierarchy was structured as follows, in ascending order: store manager, district manager, division manager, area vice president, and senior vice president.[7]  The following Waffle House employees were involved in the subject transaction:

(a)  Derrick Hooper, senior vice president for the region that included the New Orleans area;[8]

(b)  Jason Thorne, area vice president who reported to Hooper and was responsible for overseeing and managing the operations of the active restaurants within his assigned area, which did not include the Elysian Fields Property (defined below) or the Arabi Property (also defined below) because the stores at those locations had ceased operations when he served in this position, but he could assist with accessing the buildings at those locations;[9]

(c)  Birk McGee, division manager who oversaw the operations of nine stores in the New Orleans area and reported to Thorne;[10]

(d)  Jerry Billiot and Galen Richard, maintenance technicians who reported to McGee and whose weekly responsibilities consisted of visiting open restaurants within McGee's division to conduct maintenance on the properties as needed and who were available for emergency visits and repairs outside of their weekly schedule;[11]

(e)  Jeffrey Wright, vice president of property management at the Waffle House headquarters located in Norcross, Georgia, and whose duties included managing and

---

[7] Testimony of Jason Thorne.
[8] Testimony of Birk McGee.
[9] Testimony of McGee and Thorne.
[10] Testimony of McGee and Thorne.
[11] Testimony of McGee and Thorne.

supervising Waffle House's property management department, which included, but was not limited to, overseeing surplus sale property;[12] and

(f) Richard Taylor, a property manager who reported to Wright and assisted him in surplus sale property, but who did not have a managerial role or a position of authority over others in Waffle House's property management department.[13]

## III.  NON-PARTY ENTITIES

7.    Federated Historic Holdings, LLC ("Federated") is a limited liability company that was formed under Louisiana law on October 3, 2012.[14]  Federated's two members are Burka and Jacobson, with Jacobson as its managing member.[15]  Federated's primary business is to buy, develop, lease, and hold commercial real estate.[16]  When Federated purchases a property, it forms a single-purpose entity whose sole purpose is to own the property purchased.[17]  Federated then assigns its rights to that single-purpose entity.[18]

8.    Casben LLC ("Casben") is a limited liability company formed on January 29, 2013.[19]  Casben is a real estate brokerage company that owns and operates under the trade name Ben+Burka, which refers to its two members, Burka and Jacobson.[20]  Kazanoff, a licensed real estate agent, is affiliated with Casben d/b/a Ben+Burka.[21]

---

[12] R. Doc. 151 at 11; Ex. 140; Testimony of Jeffrey Wright.
[13] R. Doc. 151 at 11-12; Ex. 140; Testimony of Wright and Richard Taylor.
[14] R. Doc. 151 at 12; Ex. 140.
[15] R. Doc. 151 at 12; Exs. 85, 140.
[16] Testimony of Jacobson and Kazanoff.
[17] Testimony of Jacobson and Kazanoff.
[18] Testimony of Jacobson and Kazanoff.
[19] R. Doc. 151 at 12; Exs. 86, 140.
[20] R. Doc. 151 at 12; Exs. 86, 140; Testimony of Jacobson and Kazanoff.
[21] Ex. 140.

9.      Lavista Equipment Supply, Inc. ("Lavista") is a wholly-owned subsidiary of Waffle House[22] whose main purpose is to be the exclusive supplier to Waffle House of all equipment and furnishings used in Waffle House restaurants.[23]

## IV.   THE PROPERTIES

10.     The property at issue in this lawsuit bears the municipal address of 2924 and 2940 Elysian Fields Avenue, New Orleans, Louisiana (the "Elysian Fields Property").[24]

11.     On November 30, 2011, WH Capital purchased the Elysian Fields Property from Jacqueline M. Goldberg, as described and set forth in the cash sale filed and recorded in the Parish of Orleans, State of Louisiana, Notarial Archives No. 201146086 and Instrument No. 502501.[25]

12.     On June 11, 2013, Waffle House unit #1999 opened at the Elysian Fields Property.[26]

13.     WH Capital never executed and recorded a written declaration in the conveyance records of the Parish of Orleans, State of Louisiana, stating that any machinery, appliances, or equipment that WH Capital placed on the Elysian Fields Property for its service and improvement would be deemed its component parts.[27]

14.     On March 31, 2020, Waffle House unit #1999 ceased operations.[28]

15.     Although not the subject of this litigation, Waffle House unit #1860 is relevant to the events that occurred.  Waffle House unit #1860 was located at 6720 St. Claude Avenue,

---

[22] R. Doc. 151 at 11; Ex. 140.
[23] Testimony of Wright, Thorne, and Kirk Bodenheimer.
[24] R. Doc. 151 at 11; Exs. 1, 2, 3, 140.
[25] R. Doc. 151 at 11; Exs. 96, 140.
[26] R. Doc. 151 at 11; Ex. 140.
[27] R. Doc. 151 at 17; Ex. 140.
[28] R. Doc. 151 at 11; Ex. 140; Testimony of Thorne.

Arabi, Louisiana (the "Arabi Property"). It opened on June 10, 2009, and ceased operations on March 20, 2020.[29]

16.      The Arabi Property was also owned by WH Capital.[30]

17.      When the Elysian Fields Property and the Arabi Property ceased operations, they became surplus properties managed by Waffle House's property management division.[31]

## V.      THE CONSTRUCTION AND OUTFITTING OF WAFFLE HOUSE RESTAURANTS

18.      All new Waffle House restaurants are constructed in the same or similar four-phase process.[32]

19.      For the first two phases of construction, Waffle House hires third-party subcontractors who construct, build, and erect the basic building structure, including the building's foundation, floor, roof, walls, doors, electrical, HVAC, and plumbing.[33]

20.      Once the basic building structure is complete, Lavista provides, outfits, and installs the "equipment package" for the restaurant, which includes all equipment, furnishings, and other items necessary to operate a fully functional Waffle House restaurant.[34]

21.      The globe light fixtures are attached to the electrical.[35]

22.      The steel components that comprise the back bar unit in the kitchen area are initially delivered to restaurants on pre-set wheels, which are removed and replaced with steel pegs, allowing the back bar to stand freely on the pegs without being anchored or bolted into the floor or wall. But certain of the steel components of the back bar are screwed to the wall.[36]

---

[29] R. Doc. 151 at 11; Ex. 140; Testimony of Wright.
[30] R. Doc. 151 at 13; Ex. 140.
[31] R. Doc. 151 at 11-12; Ex. 140.
[32] Testimony of Thorne and Bodenheimer.
[33] Testimony of Bodenheimer.
[34] Testimony of Thorne and Bodenheimer.
[35] Testimony of Thorne.
[36] Ex. 74; Testimony of Thorne and Bodenheimer.

23.     The high, mid, and low bars (or counters) are installed by first positioning those items in the building and then caulking the seams into place, without their being bolted or otherwise anchored into the floor.  However, the heavy bead of caulking holds these items securely in place, preventing their being displaced.[37]

24.     The stools located adjacent to the high bar are secured to the floor with four bolts which are covered by a metal plate that is caulked around the seams.  The stools are secured by nuts to threaded bolts put in place by drilling holes in the floor.[38]

25.     Caulking is used in part to prevent water from seeping into cracks, which could lead to mold, unpleasant odors, rot, and other related issues, but the caulking also serves to keep the various items from moving out of place.[39]

26.     The seating booths are typically attached to a vertical main line board using screws, are secured in place by pins or screws, and are typically supported by legs.  The main line board is itself attached to the floor.[40]

27.     The kitchen ventilation system serves to vent smoke from the grills through a motorized ventilation fan that is located on the roof and is secured to the vent and roof using screws.  A grinder or hammer is needed to remove the exhaust hood due to the tight seal required by the fire marshal when installing it.[41]

28.     The three-compartment self-standing sink is connected to the plumbing and then connected to the wall with three screws.  A saw is required to disconnect this commercial kitchen sink from the plumbing and building.[42]

---

[37] Testimony of Jacobson, Thorne, and Bodenheimer.
[38] Testimony of Jacobson, Thorne, and Bodenheimer.
[39] Testimony of McGee and Bodenheimer.
[40] Ex. 75; Testimony of Thorne.
[41] Testimony of Bodenheimer.
[42] Testimony of Jacobson, Thorne, and Bodenheimer.

29.     Generally, Waffle House's equipment, furnishings, and other items are placed, installed, or connected in a manner that would allow for their removal, modification, or repair when necessary.[43]

30.     In 2013, Lavista installed the "equipment package" at the Elysian Fields Property.

## VI.     THE "DEIDENTIFICATION" PROCESS FOR CLOSED WAFFLE HOUSE RESTAURANTS

31.     When a Waffle House property ceases operations or is sold, Waffle House typically undertakes a "deidentification process" whereby Lavista removes the equipment, furnishings, and other items it had installed in the restaurant.[44]

32.     Before initiating the deidentification process, Waffle House may first "mothball" the property by "removing smaller appliances, cash registers, crockery, computer equipment, signage and other smaller items located in or around the restaurant," and securing the building by boarding up windows and other openings, erecting fences, and removing all external signage.[45] Afterward, the interior of the building is assessed to identify and create a checklist of the used equipment, furnishings, and other items present.  This checklist is then provided to Lavista, which is responsible for carrying out and completing the deidentification process.[46]

33.     The mothballing of the Elysian Fields Property was completed, and the initial used equipment checklist prepared, on or about January 7, 2021.[47]

34.     The deidentification process includes the removal of the sinks, shelving, back bar, booths, globe lights, high bar, low counters, stools, exhaust hood, cabinetry, among other items that were originally installed by Lavista.[48]

---

[43] Testimony of Thorne and Bodenheimer.
[44] Testimony of Wright and Thorne.
[45] R. Doc. 151 at 5.
[46] Testimony of Thorne and Bodenheimer.
[47] Testimony of Thorne and Bodenheimer.
[48] Testimony of Wright.

35.     Removal of electrical and plumbing is not a part of the deidentification process.[49]

36.     When the deidentification process is complete, the functioning used equipment is typically returned to Lavista or may be used by other Waffle House restaurants.[50]

37.     Waffle House's used equipment checklist prepared for mothballing or deidentifying a property is usually an internal document intended to record and outline the scope of work necessary for the deidentification of a property and is typically not disclosed or delivered to actual or potential third-party purchasers.[51] Yet, in conjunction with the execution of the sale of the Elysian Fields Property, a checklist for the property was provided to Federated.[52]

38.     Prior to the March 2022 closing on the Elysian Fields Property, neither Waffle House nor WH Capital disclosed to Federated or Smothered Covered at any time the existence of the deidentification process, what the process entailed, or that the process would occur before the closing.[53]

## VII.    WAFFLE HOUSE SURPLUS SALE PROPERTY

39.     A "surplus sale property" is an undeveloped piece of property, or a property where the restaurant has closed, that is owned by Waffle House or WH Capital and that they are trying to "sell off."[54] In the period leading up to August 2021, the Elysian Fields Property and the Arabi Property were each designated as a surplus sale property. It is the customary practice of Waffle House to complete the deidentification process before any surplus property is sold to a third party.

---

[49] Testimony of Bodenheimer.
[50] Testimony of Wright.
[51] Testimony of Wright and Bodenheimer.
[52] *See infra* at 16.
[53] Testimony of Jacobson.
[54] Testimony of Wright and Taylor.

40.     Wright, as vice president of property management, was responsible for selling the surplus sale properties.[55]

41.     An unsold surplus sale property has carrying costs, including utilities, taxes, and maintenance, that are incurred by Waffle House or WH Capital until the property is sold.[56]

42.     WH Capital, as owner, thus had a financial incentive to sell the Elysian Fields Property.[57]

43.     Wright's compensation consisted of a salary and a "trimester bonus."[58]

44.     If Wright did not accomplish his trimester goals, which included selling surplus sale properties, 10% part of his trimester bonus could be affected.[59]

45.     Consequently, Wright had a personal incentive to ensure that the Elysian Fields Property was placed under contract for sale and that it was ultimately sold.[60]

46.     WH Capital would financially benefit from the sale of the Elysian Fields Property, at least by eliminating the carrying costs on the property.[61]

47.     In early 2021, Waffle House and/or WH Capital offered to sell both the Arabi and Elysian Fields Properties.[62]

## VIII.   THE LETTERS OF INTENT

48.     Jacobson took the lead for Federated on the potential deals regarding the Elysian Fields Property and the Arabi Property.[63]

---

[55] Testimony of Wright.
[56] Testimony of Wright.
[57] Testimony of Wright.
[58] Testimony of Wright.
[59] Testimony of Wright.
[60] Ex. 103; Testimony of Wright.
[61] Testimony of Wright.
[62] R. Doc. 151 at 6.
[63] *Id.* at 13; Ex. 140.

49.     On April 6, 2021, Kazanoff sent an email to Burka and Jacobson, in which he stated: "I think we offer $340k for 2924 & 2940 Elysian Fields …."[64]

50.     Also on April 6, 2021, Federated began preparing a letter of intent addressed to Waffle House expressing its interest in buying the Elysian Fields Property.[65]

51.     On April 13, 2021, Federated sent two letters of intent dated April 12, 2021, to Drew Joiner of Waffle House, one with respect to purchasing the Elysian Fields Property and the other with respect to purchasing the Arabi Property, which properties were both then owned by WH Capital.[66]

52.     In one of the letters of intent, Federated proposed to purchase the Elysian Fields Property for $340,000, and in the other, the Arabi Property for $375,000.[67]

53.     Prior to sending the two letters of intent to Waffle House, Federated's Jacobson, Kazanoff, Burka, and Mouledoux did not view or inspect the interior of either the Elysian Fields Property or the Arabi Property for any purpose.[68]

54.     On April 21, 2021, Joiner, on behalf of Waffle House, sent an email to Mouledoux, with Jacobson copied, stating: "I'll get these [*i.e.,* the letters of intent] in front of our committee and get back to you next week."[69]

55.     Between April 13, 2021, and April 21, 2021, Joiner exchanged other emails with Mouledoux about the two letters of intent.[70]

---

[64] Ex. 4.
[65] *Id.*
[66] Ex. 140; Testimony of Jacobson and Kazanoff.
[67] Testimony of Jacobson.
[68] Testimony of Jacobson and Kazanoff.
[69] Ex. 6.
[70] *Id.*

56.     On June 11, 2021, Taylor, on behalf of Waffle House, advised Federated's Mouledoux that he would be taking over from Joiner because the latter had left Waffle House's employment.[71]

## IX.    THE CONTRACT TO PURCHASE THE ELYSIAN FIELDS PROPERTY

57.     On August 9, 2021, Wright, on behalf of Waffle House, signed a Real Estate Sales Agreement with respect to the Elysian Fields Property (the "Elysian Fields RESA") for a purchase price of $340,000.[72]

58.     When Jacobson signed the Elysian Fields RESA on behalf of Federated on August 10, 2021, it became effective.[73]

59.     At that time, Waffle House had not completed the deidentification process on the Elysian Fields Property.[74]

60.     The Elysian Fields RESA was drafted by a representative of Waffle House.[75]

61.     The Elysian Fields RESA concerned "the real estate, including all improvements and fixtures thereon, together with all easements, rights of way, licenses, privileges, hereditaments, and appurtenances, if any, inuring to the benefit of such land, located in the State of Louisiana, County [sic] of Orleans, and more particularly described in Exhibit 'A', generally described with a municipal address of 2924 and 2940 Elysian Fields Avenue, New Orleans, LA 70122, containing the entirety of the improvements located on approximately 18,916 SF of land (the 'Property')."[76]

---

[71] R. Doc. 151 at 13; Ex. 140.
[72] R. Doc. 151 at 13-14; Exs. 1, 140; Testimony of Jacobson and Wright.
[73] R. Doc. 151 at 13-14; Exs. 1, 140; Testimony of Jacobson and Wright.
[74] R. Doc. 151 at 6; Ex. 140.
[75] Ex. 104; Testimony of Wright.
[76] R. Doc. 151 at 13-14; Exs. 1, 140.

62.     Section 10(g) of Exhibit B attached to the Elysian Fields RESA defined "fixtures" to "include 'component parts' as the term is used in Louisiana law."[77]

63.     Section 10(e) of Exhibit B attached to the Elysian Fields RESA defined "building" to "include 'other constructions' as that term is used in the Louisiana Civil Code."[78]

64.     According to Wright, Waffle House did not agree or intend to sell any of its "equipment" to Federated as a part of the sale of the Elysian Fields Property.[79]  Regardless, pursuant to the express terms of the Elysian Fields RESA, Waffle House did agree to sell to Federated the property's component parts.

65.     Before the execution of the Elysian Fields RESA, the building on the Elysian Fields Property contained globe light fixtures; stools bolted into the flooring; high, mid, and low bars or counters affixed to cabinetry; backbar counters; seating booths affixed to cabinetry; commercial kitchen sinks; and a commercial kitchen exhaust hood (collectively, the "Subject Items").[80]  These are the items that Smothered Covered contends were wrongfully removed from the Elysian Fields Property.[81]

66.     According to Jacobson, a reasonable person or entity purchasing a second-generation restaurant would expect items like the Subject Items – that is, those he says were attached to the property – to be conveyed with the property as part of the sale, because these items complete the purpose of the building.[82]  While no representative of Federated saw the interior of the Elysian Fields Property prior to issuing the letter of intent, Federated, within days

---

[77] R. Doc. 151 at 14; Exs. 1, 140.
[78] Ex. 1.
[79] Testimony of Wright.
[80] R. Doc. 151 at 14; Ex. 140; Testimony of Jacobson and Wright.
[81] Testimony of Jacobson; Ex. 74.
[82] Testimony of Jacobson and Jack Eglé.

of executing the Elysian Fields RESA, did receive a checklist describing the property's current condition and did inspect the property.[83]

67.    The Elysian Fields RESA prohibited Waffle House from alienating "all or any portion of the Property."[84]

68.    The Elysian Fields RESA included the following "as is, where is" clause:

> AS-IS, WHERE-IS CONDITION.  Buyer agrees that, at its cost, Buyer will perform such examinations and investigations of the Property and any improvements thereon, which examinations and investigations are deemed by Buyer in its sole judgment to be appropriate or prudent, prior to Closing and that Buyer will rely solely upon such examinations and investigations (if any) in purchasing the Property.  Buyer agrees that the following disclaimer shall be included in the Deed issued pursuant to this Agreement and shall survive Closing:

> *Notwithstanding anything to the contrary herein, it is expressly understood and agreed that, except for warranties of title as set forth in this Deed, Buyer is acquiring the Property "As Is" and "Where Is," and with all faults and defects, latent or otherwise, and that Seller has not made and does not make and will not make any representations or warranties, expressed or implied, with respect to the quality, physical condition, zoning, governmental permits, availability or cost of utilities, environmental condition or contamination, expenses, value of the Property or any improvements thereon, the structural integrity, habitability or usefulness of any improvements on the Property, or any other matter or thing affecting or related to the Property or any improvements thereon (including without limitation, warranties of habitability, warranties of merchantability, and/or fitness for a particular purpose), which might be pertinent in considering whether to purchase the Property, and Buyer does hereby expressly acknowledge that no such representations or warranties have been made. Buyer further acknowledges and agrees that Seller shall not be liable or bound in any manner by any warranties, either expressed or implied, guarantees, promises, statements, representations, or information pertaining to the Property, or any improvements thereon, made or furnished by any broker, agent, employee, servant or other person representing or purporting to represent the Seller.*[85]

---

[83] *See infra* at 16, 18-21.
[84] Ex. 1.
[85] *Id.* (emphasis in original).

69.     The Elysian Fields RESA also included the following restriction prohibiting use of the property as a 24-hour "breakfast oriented" restaurant in the event of a sale:

> 6.      DEED. … Buyer agrees that the following covenant shall be included in the Deed issued pursuant to this Agreement and shall survive Closing:
>
> "Grantee herein warrants and covenants that Grantee will not use the Property for the following restaurants or food service purposes: Huddle House, Shoney's, Gabby's, Denny's, Kettle, Coffee Kettle, International House of Pancakes (IHOP), Martin's, Dunkin' Donuts, American Waffle, Waffle King, Holler & Dash Biscuit House, Brueggers Bagels, Atlanta Bagel Bakeries, Original Pancake House, Omelet Shoppe, Manhattan Bagel Bakery, Bagelicious, Chesapeake Bagel Bakery, Great American Bagel, Biscuitville, The Flying Biscuit Café, Hash House a go go, Honey Jam Café, Royal Waffle King, Biscuit House, or any type of 24-hour breakfast oriented restaurant with more than 50% of revenue coming from selling breakfast items including eggs, breakfast ham, bacon, sausage, muffins, hash browns, croissants, biscuits, waffles, cereals, pancakes, and breakfast sandwiches or melts."[86]

70.     During their negotiation of this restrictive covenant, and ahead of the execution of the Elysian Fields RESA, the parties exchanged many communications regarding the scope of its content.[87]  Jacobson explained in his testimony that this was necessary from Federated's point of view because, once acquired, it intended to lease the property as a restaurant.[88]

71.     The Elysian Fields RESA did not contain any provision allowing for a "final" walk-through or inspection by Federated in conjunction with the closing.[89]  However, the Elysian Fields RESA did give Federated, as buyer, the right to inspect the building with three days' notice to Waffle House, as seller, so it could arrange to have its representative present to unlock the building.[90]

---

[86] *Id.*
[87] *See, e.g.,* Exs. 105, 106, 109, 110.
[88] Testimony of Jacobson.
[89] Testimony of Jacobson.
[90] Ex. 1.

72.    The Elysian Fields RESA provided that if Waffle House "fails or refuses to perform its obligations" thereunder, Federated had the right to terminate the agreement or "demand specific performance" and "reimbursement of all reasonable attorneys' fees, court costs, and fees for experts or other professional services" incurred to enforce the agreement.[91]

73.    On August 11, 2021, after the Elysian Fields RESA was executed, Taylor sent an email to Jacobson attaching what he described as a "PDF … that details how the properties' buildings are currently configured."  The PDF was a task list titled "Elysian Fields (New Orleans) Property Current Condition" showing "X" marks by certain of the listed items, including: "Coordinate distribution of small equipment with [Lavista].  Leave backbar & seating package," and "Leave globe lights."[92]  The PDF nowhere mentions that a deidentification process was contemplated for the Elysian Fields Property.

74.    In contrast, the task list titled "Arabi Property Current Condition," which was also attached to the August 11, 2021 email, expressly stated that "DE-ID" (an abbreviation referring to the deidentification process for those in the know, which did not include Federated at the time) was "needed" to, *inter alia*, "[r]emove existing walk-in cooler, back-bar, cabinetry (that's in good condition) & return to [Lavista]," "[r]emove all globe lights & cap off the electrical at ceiling," and "[s]crape caulk off floors, repair/replace any damaged or missing floor & wall tile."[93]

75.    According to Waffle House, these lists constituted internal checklists prepared for, and used in conjunction with, mothballing and deidentification of a Waffle House restaurant that was no longer operating.  Waffle House representatives thus testified that the documents attached to the email were internal business documents that concerned the scope of work for

---

[91] *Id.*
[92] Ex. 13.
[93] *Id.*

deidentifying the restaurant and did not include warranties or representations regarding the scope or extent of the property to be conveyed to Federated in the event of a sale.[94]

76.     Nevertheless, as Taylor testified, Wright told him to email the lists to Jacobson.[95] Thus, Jacobson, on behalf of Federated, received these documents from Waffle House in connection with the execution of the Elysian Fields RESA indicating that certain items were being left in the Elysian Fields Property (*viz.,* the backbar and seating package, and globe lights) that had been removed from the Arabi Property (*viz.,* backbar, cabinetry, and globe lights).

77.     Despite instructing Taylor to send the lists to Jacobson, Wright testified that he did not mean to intimate to Federated that Waffle House intended to convey with the sale the listed items (*viz.,* the backbar, seating package, and globe lights) that were later removed from the Elysian Fields Property before the closing.[96]    But that is precisely what Jacobson understood.[97]

78.     Jacobson and Wright subsequently executed each of the four amendments to the Elysian Fields RESA.[98]

## X.    THE CONTRACT TO PURCHASE THE ARABI PROPERTY

79.     On August 11, 2021, Federated also signed a Real Estate Sales Agreement for the Arabi Property (the "Arabi RESA").[99]

80.     At that time, Waffle House had completed the deidentification process for the Arabi Property.[100]

---

[94] Testimony of Wright and Bodenheimer.
[95] Testimony of Taylor.
[96] Testimony of Wright.
[97] Testimony of Jacobson.
[98] R. Doc. 151 at 15; Ex. 140.
[99] R. Doc. 151 at 14; Exs. 13, 14, 140.
[100] R. Doc. 151 at 14; Ex. 140.

81.    Federated ultimately terminated the Arabi RESA and did not purchase that property.[101]

## XI.    FEDERATED'S ACCESS TO THE ELYSIAN FIELDS PROPERTY AND THE ARABI PROPERTY

82.    In August 2021, the Elysian Fields Property was enclosed by a fence and the interior of the building could not be viewed because the windows and front door were boarded up and the back door was secured with a combination lock that required the use of a four-digit code to unlock it.[102]

83.    Hence, as of that time, the Elysian Fields Property could only be accessed by removing a combination lock that secured the chain to the locked front gate and by using the four-digit code to open the combination lock securing the back door.[103]

84.    On August 10, 2021, the day he executed the Elysian Fields RESA, Jacobson first inquired about accessing the Elysian Fields Property when he sent Taylor an email in which he stated: "We went ahead and signed the Elysian Fields [RESA] to get the ball rolling on that one - see attached.  Please let us know when St. Claude [*i.e.,* the Arabi RESA] is ready for signature.  What will be the best way to get access to the properties for inspections?"[104]

85.    Taylor responded to this inquiry with an email sent to Jacobson on the same date, stating: "I will coordinate with you tomorrow about the inspection access to the properties."[105]

86.    On the morning of August 11, 2021, Taylor emailed Thorne to inquire about the means of accessing the Elysian Fields Property and the Arabi Property "in the near future."[106]

---

[101] Testimony of Jacobson.
[102] R. Doc. 151 at 14; Exs. 140, 141.
[103] Exs. 74, 141; Testimony of Bodenheimer and Thorne.
[104] Ex. 8; Testimony of Jacobson and Kazanoff.
[105] Ex. 8.
[106] R. Doc. 151 at 14; Exs. 11 ("Do you have an idea of how these building are locked up?"), 140.

87.     Minutes later, on August 11, 2021, Taylor sent an email to Jacobson, stating: "I just reached out to the Waffle House restaurant operations vice president in Louisiana about the way they lock the two property buildings.  I will follow up with you on details."[107]

88.     Shortly after noon on August 11, 2021, Taylor sent an email to Jacobson, stating: "Jason Thorne (Waffle House VP in New Orleans) is driving to both properties tomorrow and [will] confirm how each building can be unlocked.  We are going to give you every piece of information you need to successfully access each property for the inspection."[108]

89.     On the morning of August 17, 2021, Thorne emailed Jacobson to provide the combination for the lockbox on the Elysian Fields Property, which was #1999, as well as information about contacting Thorne to access the Arabi Property, which did not have a lockbox.[109]

90.     Minutes later, on August 17, 2021, Jacobson sent a text message to Thorne that states "Ben Jacobson – Arabi Waffle House."[110]

91.     Kazanoff's electronic Apple calendar entry for August 17, 2021, states "Waffle House Tours," with the listed times of 1:00 p.m. to 2:00 p.m.[111]  Federated conducted inspections of both properties on that date.

92.     On August 17, 2021, Thorne met Federated's representatives at the Arabi Property to unlock the back door and allow them access to the interior.[112]

---

[107] Ex. 10.
[108] Ex. 12.
[109] R. Doc. 151 at 14; Exs. 16, 140; Testimony of Jacobson and Thorne.
[110] Ex. 17; Testimony of Jacobson and Thorne.
[111] Ex. 9; Testimony of Kazanoff.
[112] Ex. 17; Testimony of Jacobson, Thorne, and Kazanoff.

93.     In an email sent by Burka to Kazanoff and Jacobson at 3:44 p.m. on August 17, 2021, Burka attached photographs of the Elysian Fields Property, which depict two individuals opening the gate, the interior of the restaurant, and the exterior of the restaurant.[113]

94.     Prior to August 17, 2021, no Federated representative possessed the access codes or knew of any other means to access, view, or inspect the interior of the Elysian Fields Property or the Arabi Property.[114]

95.     Thus, no Federated representative viewed or inspected the interior of the Elysian Fields Property between the time the letter of intent was sent (April 13, 2021) and when the Elysian Fields RESA was executed (August 10, 2021).  Rather, Federated first inspected the interior of the Elysian Fields Property and came to know the condition of the building contents on August 17, 2021.[115]  At that time, the deidentification process for the Elysian Fields Property had not been instituted by Waffle House.  Consequently, as viewed by Federated in August 2021, the restaurant building on the Elysian Fields Property contained the globe light fixtures affixed to the ceiling; the stools bolted into the flooring; the seating booths integrated into the cabinetry and attached to the flooring; the high, mid, and low bars or metal counters affixed to the walls or cabinetry; the kitchen exhaust hood; and the metal industrial sinks affixed to the walls and plumbing.

96.     On August 20, 2021, Taylor sent Jacobson an email with the access codes to the back doors of both the Elysian Fields Property and the Arabi Property.[116]

---

[113] Exs. 18, 73; Testimony of Jacobson and Kazanoff.
[114] Testimony of Thorne.
[115] Testimony of Thorne, Jacobson, and Kazanoff.
[116] Ex. 20; Testimony of Jacobson.

97.    On September 14, 2021, Jacobson sent an email to Wade Langlois, Burka, and Kazanoff that included the access codes to the back doors of both the Elysian Fields Property and the Arabi Property.[117]

98.    At some point after Federated's execution of the Elysian Fields RESA and its inspection of the Elysian Fields Property in August 2021, but before the closing on the property in March 2022, Ben+Burka began marketing the Elysian Fields Property as a second-generation restaurant property.  The photographs included in the marketing brochure developed for this purpose were taken on August 17, 2021, and included depictions of the interior of the restaurant, showing the Subject Items in place.[118]

## XII.    PRE-SALE CONDITION OF THE ELYSIAN FIELDS PROPERTY

99.    In October and November 2021, a few months after Federated's August 2021 inspection of the Elysian Fields Property, Federated allowed a potential lessee to conduct inspections of the property, which revealed deficiencies in the condition of the roof (including missing flashing), plumbing, and electrical wiring, as well as four missing HVAC units formerly located on the roof.[119]

100.    Federated learned about these deficiencies regarding the Elysian Fields Property upon receiving the inspection reports from the October and November 2021 inspections, which reports were provided to Jacobson and Kazanoff by Alex Royal, the broker for the potential lessee, on November 11, 2021.  Some of the damage was the result of Hurricane Ida (which made landfall near the end of August 2021).[120]

---

[117] Ex. 23; Testimony of Jacobson and Kazanoff.
[118] Ex. 100; Testimony of Jacobson, Kazanoff, and Eglé.
[119] Testimony of Jacobson and Kazanoff.
[120] Exs. 26, 27, 28; Testimony of Kazanoff.

101.    Thereafter, Federated hired Arceneaux Electric to inspect the Elysian Fields Property.  Sydney Arceneaux, III prepared a one-page report stating, *inter alia*, that the cooling motors and condenser were missing from the walk-in cooler, the vent hood motor was missing, and the four rooftop HVAC units were missing.[121]

102.    On November 29, 2021, Jacobson sent the inspection reports to Taylor at Waffle House.[122]

103.    The cost of the required repair work described in the inspection reports totaled $103,791.72.[123]

104.    Kazanoff admitted that, as of November 2021, there was "significant" amounts of damage to both properties, specifically, from "theft and Hurricane Ida."[124]

105.    In a November 29, 2021 email sent to Waffle House (Taylor), Jacobson stated in part: "Upon detailed inspections, there is significant amounts of damage to both properties, mostly as a result of theft, vandalism and Hurricane Ida.  To summarize, 2940 Elysian Fields Avenue needs about $150k worth of repairs and 6720 St. Claude Avenue needs about $200k in repairs.  See the attached inspection reports for reference for both properties, including general, electrical, HVAC, plumbing and roof inspections."[125]

106.    On December 1, 2021, Jacobson sent an email to Waffle House (Taylor) requesting a $150,000 discount off the $340,000 purchase price for the Elysian Fields Property, stating: "We would need $150k off Elysian Fields and $200k off St Claude to proceed on each. Again, when we put these under contract, we were under the impression these buildings were in

---

[121] R. Doc. 151 at 14-15; Exs. 24, 140; Testimony of Kazanoff.
[122] Ex. 29; Testimony of Jacobson and Kazanoff.
[123] Ex. 26A; Testimony of Jacobson and Kazanoff.
[124] Testimony of Kazanoff.
[125] Ex. 29.

good condition, but that is far from the reality.  They will likely continue to be vandalized and damaged further unless they are put back into commerce."[126]

107.    On December 27, 2021, Taylor sent Jacobson an email stating in part: "My director (Jeff Wright) confirmed that he will fly to LA [*i.e.,* Louisiana] to assess both properties' current conditions."[127]

108.    Jacobson and Kazanoff both testified that the Elysian Fields Property really needed only about $76,366 in repairs as of November 2021 due to Hurricane Ida, theft, and vandalism, explaining that the $150,000 figure included in their contemporaneous emails was exaggerated for negotiation purposes.[128]

109.    On January 20, 2022, Taylor sent Jacobson an email to advise that Wright "is flying to inspect the properties tomorrow."[129]

110.    On January 24, 2022, Taylor sent Jacobson an email, stating in pertinent part: "After my director's visit to both properties last week, he confirmed that our Waffle House seller party is staying put on the current purchase contract prices."[130]

111.    Through trial, neither Federated nor Smothered Covered had made any of the repairs referenced in the reports from the inspections conducted in October and November 2021.[131]

---

[126] R. Doc. 151 at 15; Exs. 31, 140.
[127] Ex. 35.
[128] Testimony of  Jacobson and Kazanoff.
[129] Ex. 36.
[130] Ex. 37.
[131] Testimony of Jacobson.

## XIII. POST-INSPECTION THEFTS AT THE ELYSIAN FIELDS PROPERTY

112.    On January 25, 2022, representatives of Waffle House contacted the New Orleans Police Department to report an intruder inside the fenced-off area surrounding the unoccupied Elysian Fields Property.[132]

113.    After receiving this report on January 25, 2022, Waffle House's Hooper directed McGee and Richard to travel to the Elysian Fields Property to assess its condition.[133]

114.    Upon their arrival at the Elysian Fields Property, McGee discovered that a non-Waffle House combination lock had been installed to secure the backdoor entrance to the interior of the building, so this lock had to be cut off in order for them to gain access to the building.[134]

115.    Hooper instructed McGee and Richard to change the lock on the back door and set the code to match the Arabi Property's store number, which was #1860. Only McGee, Richard, Hooper, and Thorne were aware of this change. Wright and Taylor were not made aware that the backdoor lock had been changed or that there was a new combination code for the new lock.[135]

116.    On or after January 25, 2022, no representative of Waffle House informed any Federated representative about its having changed the lock to the backdoor entrance to the Elysian Fields Property or advised of the new lock's combination.[136]

117.    On January 26, 2022, Taylor emailed Jacobson to tell him that "huge amounts of equipment [had been] stolen out of the [Elysian Fields] restaurant [and were] being sold on Facebook."[137]

---

[132] R. Doc. 151 at 15; Exs. 92, 140.
[133] Testimony of McGee.
[134] Testimony of McGee.
[135] Testimony of McGee and Taylor.
[136] Testimony of McGee, Thorne, and Taylor.
[137] Ex. 39; Testimony of Jacobson.

118.    Later that same day, Taylor sent another email to Jacobson, copying Wright and stating in part: "Our corporate leadership has learned that interior building appurtenances were stolen by unlocking, and relocking our Waffle House-installed combination locks."[138]

119.    When asked about Taylor's use of the word "appurtenances" in this email (Ex. 40), Jacobson testified that the meaning of the word "could be a lot of different things" but could "theoretically" include "component parts" or "fixtures."[139]  However, it is undisputed that none of the Subject Items for which Smothered Covered seeks compensation was among the stolen items or those identified as missing or deficient in connection with the October and November 2021 inspections.

120.    Also on January 26, 2022, Wright sent an email to Jacobson, stating in part: "The equipment inside the restaurant was listed for sale within the last three days on Facebook Marketplace.  The ice machine has already been sold.  We successfully apprehended a party yesterday evening gaining unlawful access to the building (using our code) to sell more items."[140]

121.    Federated did not ask about whether any security measures were taken following the break-ins or inquire about the meaning of the words "equipment" or "appurtenances" that were included in the emails it received from Wright and Taylor.[141]

122.    Based on the emails and information received from Waffle House on January 26, 2022, Federated had no reason to believe that any of the items that Waffle House reported had been stolen from the Elysian Fields Property included any fixtures or components parts, since the

---

[138] Ex. 40; Testimony of Jacobson.
[139] Testimony of Jacobson.
[140] Ex. 42.
[141] Exs. 42, 65; Testimony of Thorne, Jacobson, and Kaznoff.

only specific item referenced in the emails was the "ice machine," a readily movable piece of equipment, not a component part.[142]

123.    Between January 25, 2022, and February 14, 2022, no Federated representative accessed or inspected the Elysian Fields Property to further investigate its condition, determine the extent of the thefts, or for any other reason, prior to the termination of the extended inspection period on February 14, 2022.[143]

## XIV.    DEIDENTIFICATION OF THE ELYSIAN FIELDS PROPERTY

124.    In late January 2022, after the most recent thefts, Wright first realized that the Elysian Fields Property had not undergone the deidentification process, so he ordered that it occur.[144]    In doing so, Wright did not attempt to take into account or reconcile the more limited work described in the document purporting to list the "current condition" of the Elysian Fields Property, which was provided to Federated on August 11, 2021, with the more complete scope of work usually performed as part of the deidentification process.

125.    Moreover, no representative of WH Capital or Waffle House ever specifically told a representative of Federated that the Elysian Fields Property was undergoing the deidentification process, what that process involved, or that the Subject Items were to be removed.[145]

126.    Instead, on February 1, 2022, Taylor sent an email to inform Jacobson that Waffle House was "removing [its] equipment from the Elysian Fields restaurant" the following day.

---

[142] Testimony of Jacobson and Kazanoff; Ex. 42.
[143] Testimony of Jacobson and Kazanoff.
[144] Ex. 45; Testimony of Wright.
[145] Testimony of Wright.

The email further stated: "We are working with Internal Investigations and the NOLA police department to retrieve our missing equipment."[146]

127.    Based on the emails and information received from Waffle House on January 26, 2022, regarding the theft at the Elysian Fields Property and Taylor's use of the word "equipment" in his February 1, 2022 email, Jacobson and Federated had no reason to believe that the equipment that Waffle House would be removing from that property would include the Subject Items or other items that were, or may have been considered to be, fixtures or components parts.[147]

128.    Nonetheless, upon receipt of the February 1, 2022 email, no one from Federated made inquiries about the nature of the equipment that would be removed and thereafter made no attempt to inspect the interior of the Elysian Fields Property prior to the expiration of the extended inspection period on February 14, 2022, to determine the extent of the items that had been removed.[148]

129.    When Federated had inspected the Arabi Property in August 2021, it was largely empty – the deidentification process (though undisclosed and unexplained to Federated) having been completed by Waffle House by that time.[149]

130.    On February 2, 2022, Waffle House's Kirk Bodenheimer supervised and oversaw the removal of all remaining items located inside the Elysian Fields Property (including the Subject Items).[150]

---

[146] Ex. 46; Testimony of Taylor and Jacobson.
[147] Testimony of Jacobson and Kazanoff.  To be sure, Defendants state in their pretrial filings that "[t]he meaning of the term 'equipment' refers to movables used in activities or operations of a business enterprise that may or may not be affixed, attached or secured to a wall, floor, ceiling or other part of a building."  R. Doc. 175 at 14. Given such indeterminacy, it is unsurprising that Jacobson did not understand the term "equipment," as used by Taylor in his February 1, 2022 email, to include component parts.
[148] Testimony of Jacobson.
[149] Testimony of Jacobson and Kazanoff.
[150] Exs. 93, 94, 95; Testimony of Bodenheimer.

131.    Thus, from Defendants' perspective, the Subject Items were removed as part of the deidentification process of the Elysian Fields Property – but Federated only came to learn this later, after suit was filed.[151]

132.    From Federated's perspective, on the other hand, from the execution of the Elysian Fields RESA until February 2, 2022 (including during its August and November inspections of the property), the Elysian Fields Property had contained the Subject Items.[152]

133.    The Subject Items were sold to Lavista, which in turn, sold them for use in other Waffle House restaurants.[153]   In this additional way, Waffle House and WH Capital had a financial incentive to remove the Subject Items and install them in other Waffle House stores.[154]

134.    The Elysian Fields Property was a mirror image of Waffle House's restaurant in Sorrento, Louisiana, which was open at the time of trial.   Thus, photographs of the Sorrento Waffle House restaurant accurately depict how the equipment, furnishings, and other items (including component parts, if any) would have been placed and installed at the Elysian Fields Property.[155]

135.    Based upon the testimony and exhibits received into evidence (including, but not limited to, pre-removal photographs), the Court finds that the Subject Items were all affixed or attached to the Elysian Fields Property in some form or fashion.

136.    The globe light fixtures were attached to the Elysian Fields Property's ceiling and its electrical wiring.[156]

---

[151] Exs. 73, 74; Testimony of Jacobson, Kazanoff, and Wright.
[152] Exs. 73, 74; Testimony of Jacobson and Kazanoff.
[153] Testimony of Wright.
[154] Testimony of Wright.
[155] Testimony of Thorne.
[156] Testimony of Thorne.

137.    The entire stainless-steel backbar unit located in the Elysian Fields Property stood on pedestals that sat on the ground, but screws would have to be removed to detach it from the wall.[157]

138.    The right low bar, left high bar, and cash register area of the Elysian Fields Property were not bolted or screwed into the floor but were sealed with caulking around the seams to prevent water intrusion and movement.[158]  Thus, a person could not easily move these items due to the caulking.[159]

139.    The dish table at the Elysian Fields Property stood on steel pegs that were not secured to the floor by bolts or screws, but it was secured to the six-seat high bar unit with screws.[160]  In addition, the sinks themselves were attached to the Elysian Fields Property's plumbing system.[161]

140.    Similarly, the booths at the Elysian Fields Property were screwed into the main line vertical board (which was itself affixed to the building), although they were supported by steel legs that rested on top of the floor.[162]

141.    The stools at the Elysian Fields Property were secured to the floor by four threaded bolts covered by a metal plate that was caulked around the seams.[163]

142.    The commercial kitchen exhaust hood was bolted into an unfinished part of the wall and had to be removed with a grinder and hammer because it was sealed tight for fire protection.[164]

---

[157] Testimony of Thorne and Bodenheimer.
[158] Ex. 74; Testimony of Thorne and Bodenheimer.
[159] Testimony of Thorne.
[160] Ex. 74; Testimony of Thorne.
[161] Testimony of Jacobson, Thorne and Bondeheimer.
[162] Ex. 74; Testimony of Thorne.
[163] Ex. 74; Testimony of Jacobson, Thorne, and Bodenheimer.
[164] Testimony of Jacobson and Bodenheimer.

143.    Removal of the commercial kitchen exhaust hood from the Elysian Fields Property damaged the roof, which, in turn, in the ensuing days and months caused damage to the ceiling, light fixtures, and air vents.[165]

144.    Defendants insist that Waffle House removed the range hood, the high-bar stools, the high bar, the low bar, the booths and tables, the globe lights, and a three-chamber sink without causing significant damage to that equipment or to the building.[166]   Smothered Covered strongly disagrees.[167]   In making its point at trial, Smothered Covered relied heavily upon certain before-and-after photographs of the interior of the Elysian Fields Property, including, but not limited to, those shown here: [168]



SC 0075

---

[165] Ex. 68; Testimony of Jacobson and Kazanoff.
[166] Ex. 74; Testimony of Bodenheimer and Wright.
[167] Testimony of Jacobson.
[168] *Compare* Exs. 73, 74 (before), *with* Exs. 68, 75, 76, 78B, 79, 137 (after).  The photographs above are from Exs. 74 (p. SC0075) and 75 (p. SC0109) that were used by Smothered Covered at trial to draw the contrast. *See also* R. Doc. 202 at 17.



145.    In the run up to the closing on the Elysian Fields Property, Kazanoff prepared a brochure advertising the property to potential lessees in which he used the phrase "fully equipped" when describing the "full kitchen set up."  Jacobson reviewed the brochure before it was used and circulated.  When asked whether the brochure's use of the word "'[e]quipped' means it's equipped with equipment," Kazanoff first responded, "I don't," paused, and then stated, "I think it can mean that."[169]  The brochure is consistent with Jacobson's testimony that the Elysian Fields Property was to be marketed for lease as a second-generation restaurant.

## XV.    AMENDMENTS TO THE ELYSIAN FIELDS RESA AND TERMINATION OF THE ARABI RESA

146.    On January 31, 2022, Waffle House and Federated executed a document that was incorrectly titled "First Amendment to the Real Estate Sales Agreement" since it was really the

---

[169] Ex. 100; Testimony of Kazanoff and Jacobson.

second amendment to the Elysian Fields RESA (the "Second Elysian Fields RESA Amendment"). This Second Elysian Fields RESA Amendment extended the contractual inspection period through February 14, 2022.[170] (The first amendment had extended the inspection period through February 1, 2022.)

147. On February 11, 2022, Federated executed a third amendment to the Elysian Fields RESA titled "Amendment to the Real Estate Contract," accepting Waffle House's offer to reduce the purchase price by $10,000, from $340,000 to $330,000 (the "Third Elysian Fields RESA Amendment").[171] This reduction was to account for the deficiencies identified in the October and November 2021 inspections, as well as the post-inspection thefts.

148. Also, on February 11, 2022, Federated notified Waffle House that it was terminating the Arabi RESA,[172] which property WH Capital subsequently (on October 28, 2022) sold to Green House Arabi LLC for $370,000.[173]

149. On March 11, 2022, WH Capital and Federated executed a fourth amendment to the Elysian Fields RESA to amend "the correct name of the Seller, erroneously referred to as Waffle House, Inc., to be correctly reflected as WH Capital, L.L.C., a Georgia limited liability company" and for the other purposes set forth in the amendment.[174]

150. Jacobson for Federated and Wright for Waffle House or WH Capital executed the Elysian Fields RESA and each of its four amendments.[175]

---

[170] R. Doc. 151 at 15; Exs. 43, 140.
[171] R. Doc. 151 at 15; Exs. 1, 140; Testimony of Wright and Jacobson.
[172] R. Doc. 151 at 15; Exs. 57, 140.
[173] Ex. 71.
[174] R. Doc. 151 at 16; Exs. 1, 140.
[175] R. Doc. 151 at 13; Exs. 1, 140.

## XVI.  FEDERATED'S ATTEMPT TO ACCESS THE ELYSIAN FIELDS PROPERTY BEFORE THE CLOSING DATE

151.    On March 9, 2022, after Jacobson and Langlois exchanged emails about "figur[ing] out how to secure the [Elysian Fields P]roperty as best we can" and whether "to wait until closing" to do so, Jacobson responded: "You and I should go over there [the] day after closing and look at it together."[176]

152.    On March 15, 2022, the day before the closing, Jacobson contacted Waffle House about accessing the Elysian Fields Property.  Jacobson sent an email to Taylor requesting information about accessing the Elysian Fields Property "to survey the interior condition and make sure we have a security plan in place for when we close tomorrow" and inquiring whether Taylor could "share the code to get in" so Federated could gain access within "the next hour if you are able to share quickly."[177]

153.    At no time between November 2021 and March 15, 2022, had Jacobson (or anyone else from Federated) contacted Waffle House about accessing the Elysian Fields Property.[178]

154.    The Elysian Fields RESA required that Federated provide three days' advanced notice before inspecting the property.  Although the contracted-for inspection period expired on February 14, 2022, and the Elysian Fields RESA did not contain a final walk-through provision, Waffle House nonetheless made good-faith efforts to facilitate Jacobson's access to the property.[179]

---

[176] Ex. 60.
[177] Ex. 65; Testimony of Jacobson and Taylor.
[178] Testimony of Jacobson and Kazanoff.
[179] Testimony of Jacobson, Taylor, and Thorne.

155.    Unaware of the code change made on January 25, 2022 (after the thefts), Taylor, in good faith, sent an email reply and again provided the original code (#1999) that he first disclosed to Federated on August 17, 2021.[180]

156.    Later on March 15, 2022, in an effort to get Jacobson access to the Elysian Fields Property when the old code did not work, Taylor sent an email to Hooper asking for his assistance, but Hooper did not reply.[181]

157.    Although Taylor was unable to provide Federated with the correct combination for gaining access to the Elysian Fields Property before the closing,[182] Jacobson testified that he had no concerns about moving forward with the act of cash sale and did not ask or seek to extend the date of the closing scheduled for the next day, March 16, 2022.[183]

158.    Jacobson, who had Thorne's contact information, did not attempt to call or contact Thorne on March 15, 2022, to inquire about gaining entry to the interior of the Elysian Fields Property.[184]  But nor did Taylor.[185]

159.    Instead, Jacobson opted to seek such access by communicating with his regular point of contact, Taylor, who unfortunately provided the old, incorrect lock code and then was not able to procure timely the correct code from the person most likely to have it.[186]

160.    As of August 17, 2021, Waffle House had provided Federated with unrestricted access to the Elysian Fields Property via the lock code and did not deliberately or purposefully prevent Jacobson from accessing that property on March 15, 2022.[187]

---

[180] Exs. 16, 65; Testimony of Jacobson and Taylor.
[181] Ex. 64.
[182] Testimony of Thorne.
[183] Testimony of Jacobson.
[184] Testimony of Jacobson and Thorne.
[185] Testimony of Taylor.
[186] Ex. 65; Testimony of Jacobson, Wright, and Thorne.
[187] Exs. 16, 20; Testimony of Jacobson.

161.    Thereafter, on March 23, 2022, Federated (through Kazanoff) ultimately had to gain access to the Elysian Fields Property by cutting the locks, when it was still unable to access the property through the back door entrance due to Federated's still having the wrong code.[188]

## XVII.  FEDERATED'S ASSIGNMENT TO SMOTHERED COVERED

162.    On March 15, 2022, Federated and Smothered Covered executed an assignment and assumption of purchase agreement (the "Assignment") which "assign[ed], transfer[red], set[] over and convey[ed] to [Smothered Covered] all of [Federated's] right, title and interest in and to [the Elysian Fields RESA] effective August 10, 2021, by and between [Federated], as Buyer, and [Waffle House], as Seller, as amended from time to time … , whereby [Waffle House] agreed to sell to [Federated], and [Federated] agreed to purchase from [Waffle House], the [Elysian Fields Property]," all subject to the other terms and conditions set forth the Elysian Fields RESA.[189]

163.    Defendants were not involved with drafting the Assignment executed by Federated and Smothered Covered.[190]

164.    The Assignment nowhere mentions the assignment or conveyance to Smothered Covered of any of Federated's personal rights.

## XVIII. ACT OF CASH SALE

165.    On March 16, 2022, WH Capital and Smothered Covered executed an act of cash sale for the Elysian Fields Property and the improvements described therein.[191]

166.    Red River Bank loaned Smothered Covered the sum of $272,000 in connection with the March 16, 2022 act of cash sale for the Elysian Fields Property.[192]

---

[188] Testimony of Jacobson and Kazanoff.
[189] R. Doc. 151 at 16; Exs. 2, 140.
[190] R. Doc. 151 at 16; Ex. 140.
[191] R. Doc. 151 at 16; Exs. 3, 140; Testimony of Jacobson.
[192] R. Doc. 151 at 16-17; Exs. 66, 140.

167.    The act of cash sale contains a restrictive covenant like the one that had been included in the Elysian Fields RESA, providing in relevant part:

> Buyer herein warrants and covenants that Buyer will not use the Property for the following restaurants or food service purposes: Huddle House, Shoney's, Gabby's, Denny's, Kettle, Coffee Kettle, International House of Pancakes (IHOP), Martin's, Dunkin' Donuts, American Waffle, Waffle King, Holler & Dash Biscuit House, Brueggers Bagels, Atlanta Bagel Bakeries, Original Pancake House, Omelet Shoppe, Manhattan Bagel Bakery, Bagelicious, Chesapeake Bagel Bakery, Great American Bagel, Biscuitville, The Flying Biscuit Cafe, Hash House a go go, Honey Jam Café, Royal Waffle King, Biscuit House, or any type of 24-hour breakfast oriented restaurant with more than 50% of revenue coming from selling breakfast items including eggs, breakfast ham, bacon, sausage, muffins, hash browns, croissants, biscuits, waffles, cereals, pancakes, and breakfast sandwiches or melts.[193]

168.    The act of cash sale goes on to recite, in **bold** type, an "as is, where is" clause like the one in the Elysian Fields RESA:

> **Notwithstanding anything to the contrary herein, it is expressly understood and agreed that, except for warranties of title as set forth in this Act of Cash Sale, Buyer is acquiring the Property "As Is" and "Where Is," and with all faults and defects, latent or otherwise, and that Seller has not made and does not make and will not make any representations or warranties, expressed or implied, with respect to the quality, physical condition, zoning, governmental permits, availability or cost of utilities, environmental condition or contamination, expenses, value of the Property or any improvements thereon, the structural integrity, habitability or usefulness of any improvements on the Property, or any other matter or thing affecting or related to the Property or any improvements thereon (including without limitation, warranties of habitability, warranties of merchantability, and/or fitness for a particular purpose), which might be pertinent in considering whether to purchase the Property, and Buyer does hereby expressly acknowledge that no such representations or warranties have been made. Buyer further acknowledges and agrees that Seller shall not be liable or bound in any manner by any warranties, either expressed or implied, guarantees, promises, statements, representations, or information pertaining to the Property, or any improvements thereon, made or furnished by any broker, agent, employee, servant or other person representing or purporting to represent the Seller.**
>
> **BUYER ACKNOWLEDGES THAT THE FOREGOING WAIVERS HAVE BEEN CALLED TO ITS ATTENTION AND READ AND EXPLAINED TO**

---

[193] Ex. 3.

**BUYER, THAT SAID WAIVERS ARE GRANTED KNOWINGLY AND VOLUNTARILY BY BUYER, AND THAT SAID WAIVERS ARE A MATERIAL AND INTEGRAL CONSIDERATION FOR THIS ACT OF CASH SALE.**[194]

XIX.   **SMOTHERED COVERED DISCOVERS THAT THE SUBJECT ITEMS WERE REMOVED FROM THE ELYSIAN FIELDS PROPERTY**

169.   On March 23, 2022, when finally able to gain access to the building, Smothered Covered discovered that Waffle House and/or WH Capital (or someone acting on their behalf) had removed the Subject Items from the Elysian Fields Property.[195]

170.   On March 25, 2022, Jacobson sent an email (via Taylor) to Deborah Martin, Waffle House's new surplus property director, stating in part: "We were finally able to get access to the building and to our surprise, many of the fixtures have been removed, including the vent/hood.  This was never part of the purchase agreement.  Please advise."[196]

XX.   **EVENTS FOLLOWING THE ACT OF CASH SALE**

171.   After executing the act of cash sale, Smothered Covered has not repaired the Elysian Fields Property with respect to the damage and deficiencies identified in the inspection reports issued in connection with the October and November 2021 inspections.[197]

172.   On February 16, 2023, Ben+Burka employee Elisabeth Cooper emailed Jacobson to report to him that all electrical components had been stolen from the Elysian Fields Property.[198]

173.   Since February 2023, Smothered Covered has not repaired or replaced the electrical system components in the Elysian Fields Property.[199]

---

[194] Ex. 3 (bold type and capitals in original).
[195] Ex. 68; Testimony of Jacobson and Kazanoff.
[196] Ex. 67.
[197] Testimony of Jacobson.
[198] Ex. 72; Testimony of Jacobson and Kazanoff.
[199] Testimony of Jacobson.

174.    In the meantime, on November 3, 2022, Smothered Covered filed this suit against Defendants in state court, asserting claims for breach of contract, fraud, and violations of LUTPA.[200]  Thereafter, the action was removed to this Court.[201]

## CONCLUSIONS OF LAW

### I.    SMOTHERED COVERED'S RIGHT TO ASSERT CLAIMS AGAINST DEFENDANTS

1.    A threshold question in this litigation is what claims Smothered Covered is able to assert against Defendants by virtue of Federated's Assignment.  On March 10, 2022, Smothered Covered was formed as a limited liability company, which is a separate juridical entity distinct from its members, some of whom are also Federated's members.  *See* La. Civ. Code art. 24 ("A juridical person is an entity to which the law attributes personality, such as a corporation or a partnership."); *Renton Props., LLC v. 213 Upland, LLC*, --- So. 3d ---, 2024 WL 5232874, at *15 (La. App. 2024) ("The law considers an LLC and the member(s) comprising the LLC as being wholly separate persons.").

2.    Civil Code article 25 delineates the commencement and termination of "natural persons," as distinct from juridical persons like an LLC, "solely for the purpose of facilitating determinations about the attachment of legal rights and duties."  *Wartelle v. Women's & Children's Hosp., Inc.*, 704 So. 2d 778, 780 (La. 1997).  Comment (d) to article 24 explains that "[t]he capacity of a juridical person is governed by provisions in its charter, governing legislation, and custom."  Thus, prior to its formation (through its charter), Smothered Covered did not exist and had no capacity to be "wronged," no right to enter into a contract, and no right to assert tort, statutory, or other claims on its own behalf.  *Id*.

---

[200] R. Doc. 1-1.
[201] R. Doc. 1.

3.      Further, even after its formation, Smothered Covered had no potential standing or putative rights against any Defendant until March 15, 2022, when Federated and Smothered Covered executed the Assignment.[202]   And, with the execution of the Assignment, Smothered Covered could acquire only those rights that Federated possessed on March 15, 2022, and that Federated expressly and specifically assigned to Smothered Covered.  *DaimlerChrysler Servs. of N. Am., L.L.C. v. Sec'y, Dep't of Revenue*, 970 So. 2d 616, 621 (La. App. 2007) ("An assignee acquires no greater rights than its assignor.").

4.      Because the Assignment is a contract, whether its terms and conditions are clear or ambiguous is a question of law.  *Hoffman v. Travelers Indem. Co. of Am*., 144 So. 3d 993, 997-98 (La. 2014).  "The words of a contract are to be construed using their plain, ordinary and generally prevailing meaning, unless the words have acquired a technical meaning."  *Id.* at 998. "If the wording of the [contract] is unambiguous, then the contract must be enforced as written." *Id.*

5.      The Assignment between Smothered Covered and Federated assigned to Smothered Covered all of Federated's rights and obligations under the Elysian Fields RESA. However, the Assignment did not expressly assign or transfer any breach-of-contract, tort, LUTPA, or other claim that Federated then had a personal right to assert against Defendants resulting from its interactions with them with respect to the Elysian Fields RESA, any of its amendments, or the sale of the Elysian Fields Property.  *See Lomark v. Lavigne Baker Petroleum, L.L.C.*, 110 So. 3d 1107, 1112 (La. App. 2013) ("The assignment agreements are, however, unambiguously silent on the issue of whether assignors also assigned their personal rights that are the causes of action involved in this case – the right to sue for any alleged

---

[202] Ex. 2.

breaches of the covenants, duties, and obligations arising under the contracts occurring *prior to* execution of the assignments.   In the face of this silence, this Court should not infer that plaintiffs intended to also transfer these personal rights to the assignees of the contracts.   … Plaintiffs' rights of action to sue for alleged violations of the contracts occurring prior to execution of the assignments are plaintiffs' personal rights that accrued to them prior to execution of the assignments.   We find that these causes of action are distinct from plaintiffs' rights 'in and to' their *future* rights and obligations arising under the contracts that were clearly assigned by plaintiffs in the assignments." (emphasis in original)); *see also Disaster Relief Servs. of N.C., LLC v. Emps. Mut. Cas. Ins. Co.*, 2009 WL 935963, at *6 (W.D. La. Apr. 6, 2009) (holding that "pursuant to Louisiana law concerning obligations and assignments, any assignment of rights of action … must be expressly provided for in the act of assignment"). Therefore, Smothered Covered lacks standing to bring any breach-of-contract, fraud, or LUTPA claim against Defendants that only Federated had the right to bring following the Assignment.

6.    Defendants argue, then, that the Assignment did *not* expressly and unambiguously assign to Smothered Covered any potential claim that *Federated* had against Defendants for breach of contract, fraud, or LUTPA violation, or any other breach that allegedly occurred prior to the March 15, 2022 Assignment, including but not limited to any claim arising out of Defendants' removal of the Subject Items on February 2, 2022.   As such, say Defendants, Smothered Covered acquired and has no such rights to assert.   The Court agrees up to a point, but it does not agree with Defendants' conclusion from this point that Smothered Covered has no actionable claims against Defendants.

7.    Instead, Smothered Covered has its own right to assert any claim against WH Capital, including any claim emanating from the removal of the Subject Items, that arose after

the Assignment such as those relating to a post-Assignment breach of an obligation owed under the Elysian Fields RESA or the act of cash sale. Smothered Covered succeeded to Federated's rights under the Elysian Fields RESA and its amendments. And Smothered Covered had its own rights arising from the act of cash sale. These rights included the contractual obligation of WH Capital to transfer with the sale everything that the parties to the Elysian Fields RESA and act of cash sale had a right to expect. That the removal of the Subject Items occurred prior to the Assignment is immaterial to WH Capital's continuing obligations under Louisiana law to deliver to Smothered Covered all that it was due with respect to the Elysian Fields RESA and act of cash sale.

## II.  SMOTHERED COVERED'S BREACH-OF-CONTRACT CLAIM

8.  Smothered Covered contends that WH Capital and/or Waffle House breached the Elysian Fields RESA and act of cash sale by removing the Subject Items from the property before the closing on the act of cash sale. "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La. Civ. Code art. 1906. Under Louisiana law, the formation of a valid contract requires: (1) capacity to contract; (2) mutual consent; (3) a certain object; and (4) a lawful cause. *Id.* arts. 1918, 1927, 1966, 1971. However, "[n]o right of action for breach of contract may lie in the absence of privity of contract between the parties." *Lili Collections, LLC v. Terrebonne Par. Consol. Gov't*, 175 So. 3d 434, 436 (La. App. 2015). "The burden of proof in an action for breach of contract is on the party claiming rights under the contract." *Rebouche v. Harvey*, 805 So. 2d 332, 334 (La. App. 2001).

9.  Smothered Covered alleges breach-of-contract claims related to the Elysian Fields RESA and the act of cash sale against both Defendants. Although Waffle House is the sole

member of WH Capital, they are separate juridical entities.[203]  *See Bujol v. Entergy Servs., Inc.*, 922 So. 2d 1113, 1127-28 (La. 2004) (recognizing that a parent corporation is a distinct legal entity from its subsidiary and is not liable for the subsidiary's debts).  It is undisputed that WH Capital, not Waffle House, owned the Elysian Fields Property.[204]  It is also undisputed both that WH Capital (upon correction by amendment of the seller's name from Waffle House to WH Capital) and Smothered Covered (upon assignment of the buyer's rights from Federated to Smothered Covered) were the parties to the Elysian Fields RESA after March 15, 2022,[205] and that WH Capital and Smothered Covered were the parties to the act of cash sale.[206]  Thus, as to the Elysian Fields RESA and the act of cash sale, Smothered Covered was in privity of contract with WH Capital, not Waffle House.  Accordingly, Smothered Covered cannot assert a breach-of-contract claim against Waffle House and that claim is dismissed.

10.    To succeed on a breach-of-contract claim under Louisiana law, a plaintiff must prove: "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Favrot v. Favrot*, 68 So. 3d 1099, 1108-09 (La. App. 2011).  Under Louisiana Civil Code article 1994, "[a]n obligor is liable for the damages caused by his failure to perform a conventional obligation.  A failure to perform results from nonperformance, defective performance, or delay in performance."  La. Civ. Code art. 1994.

11.    Under Louisiana law, the Elysian Fields RESA entered into by Smothered Covered (by assignment) and WH Capital (by substitution) obligated WH Capital to sell and deliver to Smothered Covered the Elysian Fields Property, including all "fixtures" thereon.  The

---

[203] R. Doc. 1 at 4.
[204] R. Doc. 151 at 11; Exs. 96, 140.
[205] R. Doc. 151 at 13, 14, 16; Exs. 1, 140.
[206] R. Doc. 151 at 16; Exs. 3, 140.

Elysian Fields RESA defined "fixtures" to "include 'component parts' as the term is used in Louisiana law."[207]

12.    Louisiana Civil Code article 466 defines "component parts" as follows:

> Things that are attached to a building and that, according to prevailing usages, serve to complete a building of the same general type, without regard to its specific use, are its component parts.  Component parts of this kind may include doors, shutters, gutters, and cabinetry, as well as plumbing, heating, cooling, electrical, and similar systems.

> Things that are attached to a construction other than a building and that serve its principal use are its component parts.

> Other things are component parts of a building or other construction if they are attached to such a degree that they cannot be removed without substantial damage to themselves or to the building or other construction.

13.    According to the first paragraph of article 466, certain things are classified as "component parts" as a matter of law because, while also "requir[ing] a modicum of physical attachment," they serve to complete a building of the same general type according to prevailing usages – even though substantial damage would not result from the removal of such things.  *See* La. Civ. Code art. 466 revision comments (c), (d), and (h) to 2008 amendment.  These things may include cabinetry, as well as plumbing, electrical, and similar systems, but this list of examples "is merely illustrative."  *Id.* cmt. (d).  "In the application of the first paragraph of [article 466], the specific use of the building is not to be considered, nor is any specific industrial or commercial activity that may happen to be conducted within the building."  *Id.* cmt. (f). Nevertheless, "in order to serve to complete a building, a thing need not be of such necessity or

---

[207] R. Doc. 151 at 14; Exs. 1, 140.  The act of cash sale, which does not contain an integration or merger clause, *see* Ex. 3, is properly read in consonance with the parties' express understanding of Louisiana terms as set out in the Elysian Fields RESA.  *See* Ex. 1.  The clause in the act of cash sale that Defendants label an integration clause (*see* R. Docs. 175 at 36 & n.136; 205 at 11 & n.40) does not bear this weight; instead, this clause is Smothered Covered's one-way agreement to release WH Capital from liablity for its representatives' previous promises regarding the property, not WH Capital's own such promises.  After all, the clause nowhere provides that any prior written agreements (specifically, here, the Elysian Fields RESA) are actually *merged* into the act of cash sale, which agreement is a much more stripped-down form of contract than the RESA.

importance that, in its absence, a construction would not be considered to be a building." *Id.* cmt. (e).

14.    According to the third paragraph of article 466, other things are "component parts" of a building if "attached to such a degree that they cannot be removed without substantial damage to themselves or to the building." As revision comment (b) to the 2008 amendment of article 466 explains:

> The substantial damage test appearing in the third paragraph of this Article … is carried forward … without change in the law applicable to that test. If a thing is permanently attached to a building … to such a degree that it cannot be removed without causing substantial damage either to itself or to the building or other construction, then the thing is a component part of the building under the third paragraph of this Article … whether or not the thing satisfies the test[] of [the first paragraph].

15.    The Fifth Circuit has stated that items "permanently" connected to a building's interior wiring, in such a way that skill and knowledge of electricity and electrical wiring are required for their installation and removal, are not movable from a societal viewpoint and are thus component parts of the building to which they are attached. *Equibank v. U.S. IRS,* 749 F.2d 1176, 1179 (5th Cir. 1985).[208] In the court's words, they are "fixed in place." *Id.* These items include "built-in stoves or ovens, wall and ceiling electric heaters, central heating and air conditioning, heat pumps, electrical hot water heaters, built-in public address and alarm systems, overhead fans, interior, physically attached light fixtures, exterior lighting, automatic garage door controls, and like electrical equipment." *Id.* From the foregoing, the Fifth Circuit in

---

[208] The Court is cognizant of article 466's relatively recent interpretive history and legislative revision, including, particularly, the legislature's adoption of the latest revision in 2008 (excerpted above). *See* La. Civ. Code art. 466 revision comments (a) and (h) to 2008 amendment (describing the revised article as "a fresh start in [this] area of law" and noting that "[p]rior jurisprudence remains relevant only to the extent that it employs principles consistent with those provided under this [revised] Article," but then going on to reference with approval several cases, including *Equibank,* as support for certain propositions of law embodied in article 466).

*Equibank* concluded that "a lamp which is simply plugged into a socket is a movable," but "an installed light fixture … becomes a component part of the building." *Id.* at 1180.

16.    WH Capital invokes a dictionary definition of the term "equipment" (presumably in reference to Lavista's "equipment package") to urge that the Subject Items are properly classified as movable items, not component parts, *i.e.,* things attached to a building that serve its general purpose.  In doing so, it relies on *Showboat Star Partnership v. Slaughter*, 799 So. 2d 554, 559 (La. 2001) – which held that a vessel was to be viewed as a general-purpose vessel, not as a floating casino, in making a determination concerning what was a component part – to contend that, in deciding whether the Subject Items were component parts, the building on the Elysian Fields Property should not be viewed as a restaurant, which was its specific use, but merely as a commercial building.  The Court rejects WH Capital's attempt to classify the Subject Items by use of a dictionary definition of a term ("equipment") that does not even appear in article 466.

17.    Instead, the Court concludes that the Subject Items are component parts under Louisiana law, because either (1) they are encompassed by the expressly referenced example of "cabinetry" under the first paragraph of article 466 ("things that, according to prevailing usages, serve to complete a building of the same general type") or (2) they were built-in items, fixed in place, whose removal occasioned substantial damage to themselves or to the building under the second paragraph of article 466.  This includes the following items: the globe lights connected to the electrical system; the stools bolted to the floor; the seating booths integrated into the cabinetry; the high, mid, and low bars or counters integrated into the cabinetry or affixed to the walls; the kitchen exhaust hood welded in place and vented to the roof; and the industrial kitchen sinks connected to the plumbing.

18.    WH Capital argues, though, that Lavista's removal of the Subject Items did not cause substantial damage because it just required removing a few screws and caulking and only minor repairs were required, if any at all.  While the Court recognizes that the removal did not require a wrecking ball, the before-and-after photographs of the interior of the restaurant show that there was indeed substantial damage occasioned by what was removed and how it was removed, which, as attested at trial, sometimes involved detachment of items from the electrical and plumbing systems (globe lights and sinks), caused damage to the building (the roof upon removal of the exhaust hood), and required tools like grinders, hammers, bolt removers, saws, screwdrivers, wrenches, and scrapers.  That Lavista was experienced in such removals, as part of Waffle House's deidentification process, does not mean the removal could not and did not result in substantial damage.

19.    Alternatively, the Subject Items are component parts under the second paragraph of article 466 because they are things attached to an "other construction" that serve its principal purpose.  This conclusion follows from the parties expressly choosing in the Elysian Fields RESA to define the term "building" to include "other constructions" for purposes of the Louisiana Civil Code (and thus article 466).[209]  The two terms are thus interchangeable.  This contractual definition – which, like the definition of "fixture" in the RESA, also applies to the act of cash sale – brings into play the second paragraph of article 466 which provides that "[t]hings that are attached to a *construction other* than a building and that serve its principal use are its component parts."  La. Civ. Code art. 466 (emphasis added).  The evidence at trial established beyond doubt that the principal use of the building on the Elysian Fields Property was as a restaurant.  Jacobson, Kazanoff, and Eglé all testified to this effect and that the building's configuration as a restaurant was a significant reason Federated was interested in acquiring the

---

[209] Ex. 1 (setting out this definition in Exhibit B of the RESA).

property because it would be easier to market, lease, or sale as such in the foodie-rich New Orleans environment.  In this way, then, to determine whether the Subject Items were component parts of the building on the Elysian Fields Property under article 466, the building, as an "other construction," can properly be examined through the lens of its specific use as a restaurant.  The evidence at trial also established beyond doubt that each of the Subject Items was a thing attached to the building (*i.e.,* other construction) to serve its principal purpose as a restaurant: after all, the seating booths, bar stools, counters, kitchen exhaust hood, kitchen sink, and even the globe lights are all items that were specifically incorporated into the building to operate it as a Waffle House restaurant.  Accordingly, on this additional ground, the Subject Items were component parts of the Elysian Fields Property under the second paragraph of article 466.

20.    This reading of the Elysian Fields RESA and act of cash sale makes perfect sense when other provisions of these instruments are read *in pari materia*, including, especially, the restrictive covenant requiring that Federated/Smothered Covered not use the property "for the following restaurants or food service purposes," going on to specifically list by name 26 brands of "breakfast oriented restaurants," and thus implying that the property was anticipated by the parties to be used as some other kind of restaurant whose use, type, or brand was not prohibited by the covenant.[210]

21.    Regardless, Defendants argue that Smothered Covered has no right to recover for any of the Subject Items because the act of cash sale constitutes the full agreement between the parties and its "as is, where is" clause means that the sale could not have included the Subject Items – which had been removed from the building before the act of cash sale was executed.  In other words, Defendants contend that, because the Subject Items had been removed prior to the closing, they were not part of what was sold.  Smothered Covered responds that the "as is, where

---

[210] Exs. 1, 3.

is" clause cannot mean that the composition of what WH Capital was bound to deliver pursuant the Elysian Fields RESA and act of cash sale was subject to unilateral alteration by the physical removal of items that were the subject of the RESA (a contract to sell) and act of cash sale (a contract of sale); instead, says Smothered Covered, the clause more properly means that WH Capital was obliged to transfer what it agreed to deliver but only in its existing condition.[211]  Said differently, Smothered Covered contends that Louisiana law obligates a seller to "deliver to the buyer the full extent of the immovable sold," La. Civ. Code art. 2491, which includes its component parts.  While a seller is allowed to waive its warranty against redhibitory defects so long as the waiver is clear, unambiguous, and brought to the attention of the buyer, *see id.* art. 2458, "nowhere in [the Louisiana Civil Code] is there a provision allowing for waiver of the primary obligation to deliver immovable property to its full extent."[212]  And so, concludes Smothered Covered, the waiver embodied in the "as is, where is" clause "only applies to redhibitory defects."[213]  The Court agrees.  *See, e.g., Shelton v. Standard/700 Assocs.,* 798 So. 2d 60, 63 (La. 2001) (discussing similar "as is, where is" clause as a waiver of the warranty against redhibitory defects); *Vitter v. Blaize,* 376 So. 3d 193, 197 (La. App. 2023) (same).  Moreover, any different conclusion would allow a seller to use an "as is, where is" clause as a basis to unilaterally change, by the physical removal of items or otherwise, the composition of the very thing (the contract's object) it has contracted to deliver.  In the end, Defendants' argument regarding the "as is, where is" clause is without merit, because this is not a case involving a defect in the thing delivered, but the delivery of a different thing.

22.     Defendants argue that Smothered Covered has no claim against Waffle House as to the Subject Items under the Elysian Fields RESA because the items were physically removed

---

[211] *See, e.g.,* Testimony of Jacobson.
[212] R. Doc. 202 at 2-3.
[213] *Id.* at 3.

from the building before the Assignment occurred and Federated did not assign to Smothered Covered any such claim, which was solely Federated's personal right, not a real right.  In other words, the Subject Items were already gone when Federated assigned its rights to Smothered Covered, so Smothered Covered could not succeed to any right to those items at that point.  The Court has already dismissed any breach-of-contract claim Smothered Covered asserts against Waffle House; consequently, to the extent this argument merely seeks this same relief, it is unnecessary.  But to the extent WH Capital is trying to argue that the physical absence of the Subject Items at the time of the Assignment means that Smothered Covered has no claim to such items, it misapprehends the claim.  The claim Smothered Covered asserts is for the right under the Elysian Fields RESA and act of cash sale to have delivered to it the contract's object (including the component parts of the building on the Elysian Fields Property) that the parties agreed would be delivered.  That Waffle House physically removed these items from the property before the Assignment and closing does not abrogate WH Capital's obligation for delivery of these items arising from the contracts.

23.    Lastly, Defendants argue that Federated's failure to inspect the Elysian Fields Property after receiving the February 1, 2022 email advising of Waffle House's plan to remove its "equipment," and Federated's acceptance of the $10,000 reduction in the purchase price of the Elysian Fields Property on February 11, 2022, estop Smothered Covered, as Federated's assignee, from asserting any claims against Defendants arising out of the removal of the Subject Items on February 2, 2022.  The February 1 email did not (and could not of itself) alter WH Capital's obligations under the Elysian Fields RESA and act of cash sale to deliver the entirety of the thing it (or Waffle House prior to the correction) had contracted to deliver, so the first of Defendants' arguments fails.  The second of these arguments also fails because the price reduction was made

to account for the deficiencies noted in the October and November 2021 inspections (which had identified items missing or damaged as a result of Hurricane Ida, theft, or other causes) and for the additional thefts occurring in January 2022, not to account for Waffle House's removal of the Subject Items as part of a deidentification process, the nature and scope of which were never disclosed to Federated or Smothered Covered.

24.    In sum, WH Capital breached both the Elysian Fields RESA and the act of cash sale by delivering to Smothered Covered the Elysian Fields Property without the Subject Items that were its component parts.  La. Civ. Code arts. 2475 ("The seller is bound to deliver the thing sold ...."), 2491 ("The seller must deliver to the buyer the full extent of the immovable sold.").

## III.    SMOTHERED COVERED'S FRAUD CLAIM

25.    Under Louisiana law, "fraud" is defined as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other" and can also result from silence or inaction.  La. Civ. Code art. 1953.  The elements of a fraud cause of action are: (1) "a misrepresentation of material fact"; (2) "made with the intent to deceive"; (3) "where there was a reasonable and justifiable reliance by the plaintiff and resulting injury."  *Riedel v. Fenasci*, 270 So. 3d 795, 801 (La. App. 2018). "[F]raudulent intent, or the intent to deceive, is a necessary and inherent element of fraud[;] [f]raud cannot be predicated upon mistake or negligence, no matter how gross."  *Charming Charlie, Inc. v. Perkins Rowe Assocs., L.L.C.*, 97 So. 3d 595, 599 (La. App 2012).  A plaintiff must prove fraud by a preponderance of the evidence, and "[c]ircumstantial evidence, including highly suspicious facts and circumstances, may be considered in determining whether fraud has been committed."  *Lomont v. Bennett*, 172 So. 3d 620, 629 (La. 2015).

26.     Even if Smothered Covered had standing to pursue a fraud claim, it would not prevail.  So, while Defendants' understanding of the contractual obligations flowing from the Elysian Fields RESA and act of cash sale were incorrect as outlined above, there is no indication that they intended their various communications about those contracts to deceive Federated or Smothered Covered.  On the one hand, Waffle House formulated its communications against the backdrop of its regular business practices (including its customary step of mothballing and deidentifying its surplus sale properties).    On the other hand, Federated filtered these communications from Waffle House, with no knowledge of the existence or scope of the deidentification process, but with its own expectation and plan to market and lease the Elysian Fields Property as a second-generation restaurant.  Thus, while Waffle House's communications about the property may have been at cross purposes with those of Federated, they were not designed to deceive.  When Waffle House decided to undertake the deidentification process at the Elysian Fields Property, neither Wright nor any other representative of Defendants manifested any intent for that undertaking to defraud Federated or Smothered Covered. Defendants did fail to explain to Federated (and later Smothered Covered) what they understood the nature and extent of the deidentification process to entail, but such a failure does not mean that Defendants intended their communications to defraud Federated or Smothered Covered in any way.  This is true even with respect to the last step before the Subject Items were removed from the Elysian Fields Property.  Taylor told Jacobson that Waffle House was removing its "equipment."  By using the term "equipment," Taylor meant to convey that the items to be removed would include all items Lavista had placed into the Elysian Fields Property as part of the "equipment package" to adapt the property for operation as a Waffle House restaurant, but Jacobson understood the term "equipment" to mean something less, and certainly not to include

the Subject Items.  Consequently, in his emails, Taylor, and by extension Waffle House, had no intent to deceive Federated, especially considering that the contracted-for inspection period remained open for almost two weeks after the Subject Items were removed, and Federated (Smothered Covered), once told that Waffle House was removing its equipment, could have exercised its right of inspection in order to ascertain the scope of what was removed.  At most, this was a misunderstanding between the parties.  Nor did Waffle House actively try to prevent representatives of Smothered Covered from entering the Elysian Fields Property the day before the closing.  Although there was also a lack of communication regarding the lock combination, there is no evidence that such miscommunication resulted from ill intent.  Hence, the Court finds that, based on the entirety of the evidence developed at trial, there was no intent to defraud on the part of Defendants, even if there was rampant misunderstanding and miscommunication among the parties.

## III.    SMOTHERED COVERED'S LUTPA CLAIM

27.    The LUTPA prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  La. R.S. 51:1405(A).  To prevail on a LUTPA claim, a plaintiff "must 'prove some element of fraud, misrepresentation, deception or other unethical conduct.'"  *IberiaBank v. Broussard*, 907 F.3d 826, 839 (5th Cir. 2018) (quoting *Tubos de Acero de Mexico, S.A. v. Am Int'l Inv. Corp.*, 292 F.3d 471, 480 (5th Cir. 2002)).  "The range of prohibited practices under LUTPA is extremely narrow," and "a court should find a practice unfair under the statute only when the practice offends established public policy and is immoral, unethical, oppressive or unscrupulous" and undertaken "with the specific purpose of harming competition."  *Id.* at 839 (alteration, internal citations, and quotations omitted).  If a court finds that a LUTPA claim "was groundless and brought in bad faith or for purposes of

harassment, the court may award to the defendant reasonable attorney fees and costs." La. R.S. 51:1409(A).

28.    Even if Smothered Covered had standing to pursue a LUTPA claim (which only could relate to acts occurring after the Assignment), it would not prevail. Because there was no fraud, but rather, as discussed above, misunderstandings and miscommunications as to, *inter alia*, the meaning of "equipment" and what exactly was being removed from the Elysian Fields Property in February 2022, Smothered Covered cannot prevail on its LUTPA claim. However, the Court does not discount the understandable perception of Smothered Covered's principals that they were hoodwinked and deeply wronged by Defendants' conduct, even though the Court has determined that this conduct did not involve the egregious actions amounting to a LUTPA violation.

29.    Given the course of events that transpired, this Court finds that the LUTPA claim, even when understood as confined to post-Assignment events, was not brought in bad faith or for the purposes of harassment. Thus, the Court declines to award attorney's fees to Defendants.

## IV.    DAMAGES

30.    A plaintiff "has the burden of proving any damage suffered by it as a result of a breach of contract." *L & A Contracting Co. v. Ram Indus. Coatings, Inc.*, 762 So. 2d 1223, 1235 (La. App. 2000). "'Actual damages arising from a breach of contract must be proven; they cannot be merely speculative or conjectural.'" *Payphone Connection Plus, Inc. v. Wagners Chef, LLC*, 276 So. 3d 589, 598 (La. App. 2019) (quoting *LeBlanc v. Gibbens Pools, Inc.*, 447 So. 2d 1195, 1197 (La. App. 1984)). "It must appear reasonably certain that the amount of damages rests upon a certain basis." *Ross & Wallace Paper Prods., Inc. v. Team Logistics, Inc.*, 308 So.

3d 346, 355 (La. App. 2020).  "The sufficiency of proof of damages must be determined in relation to the particular contract at issue and the circumstances surrounding its breach."  *Id.*

31.    Loss of profit is an item of damages recoverable for breach of contract.  La. Civ. Code art. 1934.  "The general rule is that while damages for loss of profits may not be based on speculation and conjecture, such damages need be proven only within a reasonable certainty." *Ross & Wallace Paper Prods.,* 308 So. 3d at 355-56.  "Broad latitude is given in the proving of lost profits as damages."  *Id.* at 356.

32.    WH Capital argues that it owes no contractual damages to Smothered Covered because it did not execute and record a written declaration in the conveyance records of the Parish of Orleans, State of Louisiana, stating that any machinery, appliances, or equipment placed on the Elysian Fields Property for its service and improvement would be deemed to be its component parts.[214]  While true, this is not the extent of the test for a breach-of-contract claim. Instead, the test is whether WH Capital failed to perform or otherwise violated the terms and conditions of the Elysian Fields RESA or act of cash sale.  The events leading up to the closing are critical in resolving this question.  First, for the reasons set out above, in the Elysian Fields RESA, Waffle House promised to sell to Federated the Elysian Fields Property, including its component parts.  Second, that Waffle House removed some of these items as part of its deidentification process did not alter its obligation to deliver them as part of the sale, even though it expressly told Federated, ahead of the closing, that it was removing its "equipment." Third, Waffle House transferred its obligations under the Elysian Fields RESA to WH Capital when the latter was substituted for the former.  Fourth, Smothered Covered succeeded to the rights and obligations of Federated with the execution of the Assignment.  In sum, at the closing, WH Capital then had the obligation to deliver to Smothered Covered the Elysian Fields Property,

---

[214] R. Doc. 151 at 17.

including its component parts under the Elysian Fields RESA.  It did not do so.  Consequently, WH Capital breached its contracts with Smothered Covered, and Smothered Covered is entitled to recover actual damages for the component parts that should have been delivered with the Elysian Fields Property.

33.    But WH Capital argues that the absence of any such items (which were part of the equipment Waffle House removed from the Elysian Fields Property on February 2, 2022, as part of the deidentification process) did not cause or contribute to Smothered Covered's alleged inability to lease or rent the Elysian Fields Property to a third party after the closing on the act of cash sale.[215]  Again, this is not the test for determining whether WH Capital owes damages for a breach of contract.

34.    More to the point, WH Capital argues that Waffle House's removal of the used equipment, furnishings, and other items did not affect or diminish the value of the Elysian Fields Property.[216]  In doing so, WH Capital points to the three approaches used by Louisiana courts "when assessing damages to property: 'the cost of restoration if the thing damaged can be adequately repaired; the difference in value prior to and following the damage; or the cost of replacement new, less reasonable depreciation, if the value before and after the damage cannot be reasonably determined, or if the cost of repairs exceeds the value of the thing damaged.'"[217] WH Capital goes on to argue that, if any damages are awarded, that they should be based on the second approach, i.e., a before-and-after valuation of the building, and limited to a relatively negligible amount (ranging between zero and $25,000), relying on the testimony of its expert, Wesley Moore, who testified that, through the years, brokers have told him that the value (or

---

[215] In so contending, Defendants point to the testimony of Jacobson and Eglé.
[216] Testimony of Moore.
[217] R. Docs. 175 at 39 (quoting *Carter v. Gulf States Util.,* 44 So. 2d 817, 820 n.11 (La. App. 1984)); 205 at 27 (same).

"contribution") of FF&E in buildings of this general type (*i.e.,* "quick service restaurants") would fall within this low range. The Court does not find this testimony compelling since it has more the character of anecdote, a guess, or, at best, a very rough estimate, than the kind of substantiated damage model the law requires. Instead, the Court find that the most appropriate approach to calculating damages in this case is the first, *i.e.,* the cost of restoration, since the property can be repaired and Smothered Covered's damages thereby more aptly compensated. As evidenced by the marketing materials Smothered Covered developed ahead of the closing, it expected to market the property to third parties as a potential second-generation restaurant site. There was extensive testimony at trial establishing that the market for second-generation restaurants in the New Orleans area was greater than that for other uses.[218] If it was necessary for Smothered Covered to refit the property for marketing as a second-generation restaurant, it would have to reinstall the items Waffle House removed and make attendant repairs to the building, which would compel Smothered Covered to absorb costs (and, thus, sustain damages) it would not otherwise have incurred. Hence, Smothered Covered has sustained specific damages for procuring and reinstalling each of the Subject Items and making the necessary repairs.

35. It is also Defendants' position that, while Smothered Covered maintains that the repair costs for procuring and reinstalling the items removed totals a six-figure amount, the actual total cost of the "equipment" used at the Elysian Fields Property was only about $16,146.90,[219] plus the cost of the globe lights at around $60 each.[220] Defendants say that the Court should disregard the testimony of Smothered Covered's damages expert, Robbie M. Poche, Jr., because, *inter alia*, his calculations for Smothered Covered's loss includes items and deficiencies that are not at issue; he failed to use comparable prices for the same or similar

---

[218] Testimony of Jacobson, Kazanoff, and Eglé; Ex. 100.
[219] Ex. 87A; Testimony of Poche.
[220] Testimony of Bodenheimer.

equipment or use dimensions and measurements from any Waffle House restaurant similar to Unit #1999 (the Elysian Fields Property); and he failed to apply depreciation to discount the value of items bought new to replace the removed items, instead using the purchase prices for new items.  The Court rejects Defendants' position since it relies on the very dated 2013 costs assigned to the Subject Items pursuant to the internal cost-accounting and special pricing arrangement Waffle House had with its wholly-owned company, Lavista, at installation.  The costs Smothered Covered will bear in 2025 to procure and reinstall these items, and then to make necessary repairs, are not fairly relegated to 2013 values.  The Court credits Poche's testimony, finding that his model (which was based on Xactimate pricing estimates or, for items not within the Xactimate database, his research of comparables) and his assumptions (which were built on photographs and plans of the Waffle House restaurant building on the Elysian Fields Property) constitute well-accepted methodology and come within the range of reason for damages of this kind.

36.    Defendants further contend that Smothered Covered sustained no damage because the value of the Elysian Fields Property post-sale exceeds the amount it paid for the property. Thus, Defendants observe that the March 4, 2022 appraisal report by Eric P. Moskau, MAI, R/W-AC, states that the Elysian Fields Property, as of February 23, 2022, had a market value of $340,000, and a value of $350,000 based on the cost approach, and a land value of $360,000.[221] And, in accordance with the March 16, 2022 act of cash sale, Smothered Covered paid WH Capital $330,000 to purchase the Elysian Fields Property, less than any of the appraised values. Again, this is not the test for determining the damages Smothered Covered sustained were it compelled, as part of its effort to make the property ready to market as a second-generation

---

[221] R. Doc. 151 at 15-16; Exs. 58, 140.

restaurant, to reinstall the items Waffle House removed as part of the deidentification process and then to make any attendant repairs to the building.

37.    Finally, Defendants argue that Smothered Covered is not entitled to recover damages because it has not mitigated its damages.  Thus, they say, after executing the act of cash sale, Smothered Covered has not repaired or performed any remedial work on the Elysian Fields Property with respect to the damage and deficiencies that Federated identified through the inspections it had conducted in October and November 2021, including, but not limited to, roof repairs and replacement of HVAC and electrical systems.[222]  Further, on February 16, 2023, Ben+Burka employee Elisabeth Cooper emailed Jacobson to report that all electrical system components had been stolen from the Elysian Fields Property.[223]  And since February 16, 2023, Smothered Covered has not repaired or replaced electrical system components at the Elysian Fields Property, which also has prevented the property from being leased or rented to any third party.[224]  Moreover, say Defendants, due to Smothered Covered's failure to make repairs or otherwise mitigate their damages, the Elysian Fields Property has continued to experience thefts.[225]  In partial response to these contentions, Smothered Covered insists that the electrical system was stolen because the Elysian Fields Property was unoccupied in February 2023, and it was unoccupied due to Defendants' breaches of their obligations to it.[226]  All of this may be so, but Smothered Covered does not seek in this lawsuit to be compensated by WH Capital for all of these losses, and none of WH Capital's arguments undermine Smothered Covered's right to recover the costs it would be forced to incur to replace the Subject Items that constitute component parts under the Elysian Fields RESA and act of cash sale.  That Smothered Covered

---

[222] Testimony of Jacobson.
[223] Ex. 72; Testimony of Jacobson and Kazanoff.
[224] Testimony of Jacobson.
[225] Testimony of Jacobson and Kazanoff.
[226] Testimony of Jacobson.

has chosen to seek recovery for these losses before making any repairs does not affect its entitlement to recover any such losses in amounts that are established with reasonable certainty. Nevertheless, as explained below, Defendants' arguments have more force with respect to any recovery for lost profits.

38.    Smothered Covered presented Poche's expert testimony that it will cost the following amounts to replace the Subject Items removed from the Elysian Fields Property – in other words, to place the property back into the condition it was pre-removal (in Poche's words, "to make it whole"):

    a.  $34,974.47 to procure commercial exhaust hood and associated parts;

    b.  $4,883.26 to procure the sinks;

    c.  $5,727.46 for a plumber to reinstall the sinks and exhaust hood;

    d.  $4,460.52 to procure the globe lights;

    e.  $28,839.58 to procure the booths;

    f.  $15,678.27 to procure the counters;

    g.  $9,038.96 to procure the stools;

    h.  $5,216.91 to procure the backbar;

    i.  $1,680.66 to procure the wire shelving; and

    j.  $15,792.34 for construction costs to reinstall the foregoing items and perform the associated construction work.[227]

39.    To repair the ceiling damage caused by the removal of the Subject Items, it will cost Smothered Covered:

    a.  $10,560.00 to have the electrical system in the ceiling evaluated;

    b.  $23,230.78 to replace the ceiling; and

---

[227] Exs. 130, 138; Testimony of Poche.  These amounts total $126,272.43.

c. $7,232.10 to replace the fluorescent fixtures.[228]

40.    The Court finds that the foregoing amounts (which total $167,295.31) are all supported by ample testimony and are reasonable.

41.    In support of its claim for lost profits, Smothered Covered asserts that it intended to purchase the Elysian Fields Property, with the Subject Items, and then lease it to a restaurant tenant, because second-generation restaurants are the most attractive and in-demand properties for lease in the New Orleans area.[229]  Smothered Covered elicited testimony supporting the proposition that it would have required only four months or less after the act of cash sale to secure a restaurant tenant for the Elysian Fields Property, marketed as a second-generation restaurant, with the Subject Items in place.[230]  Thus, at a minimum, according to Smothered Covered, it expected to have the Elysian Fields Property leased to a restaurant tenant by September of 2022 for $4,500 per month under a triple net lease to include property taxes, insurance, and maintenance.[231]  The property taxes, insurance, and maintenance for the Elysian Fields Property were $1,265.40 per month in 2022, $1,461.98 per month in 2023, and $1,767.47 per month in 2024.[232]  And Smothered Covered presented testimony that, upon receipt of the money to perform construction, it will take at least a year to complete the work to get the Elysian Fields Property in shape to market as a second-generation restaurant and have a tenant paying rent.[233]  In this way, Smothered Covered computes its total lost rent through December 2025, a

---

[228] Exs. 130, 138; Testimony of Poche.  These amounts total $41,022.88.  Defendants argue that an award for replacement of the electrical system is not warranted because the post-removal theft of electrical components from the building cannot be attributed to the removal of the Subject Items.  But the award is not made for the electrical components but for damage to the electrical system caused by the removal itself, particularly, the damage to the ceiling that permitted rainwater intrusion which damaged the electrical system.

[229] Ex. 105; Testimony of Jacobson, Eglé, and Kazanoff.

[230] Testimony of Jacobson and Eglé.

[231] Testimony of Jacobson.

[232] Testimony of Jacobson.

[233] Testimony of Jacobson.

year after trial, to be about $175,000; and its total lost triple net expenses for this same period to be $63,257.19.[234]

42.    However, the Court finds that Smothered Covered's claim for lost profits is not established with a sufficient degree of reasonable certainty to permit recovery.  The evidence presented for leasing the Elysian Fields Property as a second-generation restaurant is simply too conjectural or speculative as would afford the Court a reasonable basis to make an award of lost profits.  For example, because the repairs identified by the 2021 inspections (roof work) and required by the subsequent thefts (replacement of stolen electrical components) were never made, the evidence concerning the prospects for leasing the property is predicated on questionable assumptions and, consequently, does not rise to the level of the requisite showing.

43.    Smothered Covered also claims that Defendants are responsible for its losses resulting from the increased insurance costs and the theft of the electrical system components in 2023 because the Elysian Fields Property remained vacant – that is, unoccupied by any tenant or successor – due to their conduct.  The Court finds that Smothered Covered, as owner of the property at the time of this theft, was responsible for mitigating its losses and Defendants are not liable for any such losses.

44.    Smothered Covered has incurred attorney's fees, expert witness fees, expenses for other professional services, and court costs as a result of WH Capital's breach of the contracts,[235] and therefore is entitled to an award of such fees and costs.  The Court will order the parties to make submissions concerning the amount of the fees and costs to be fixed.

---

[234] Testimony of Jacobson.  Smothered Covered also developed testimony regarding anticipated increases in rent and triple net expenses for any award until paid, as well as return rates anticipated from the receipt of such amounts.  In view of the Court's treatment of Smothered Covered's claim for lost profits, it is unnecessary to outline the particulars for these claimed amounts.

[235] Testimony of Jacobson.

## CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that there be judgment in favor of Smothered Covered on its breach-of-contract claim against WH Capital, for which Smothered Covered is awarded $167,295.31.

IT IS FURTHER ORDERED that there be judgment in favor of WH Capital on Smothered Covered's claims for fraud and LUTPA violations, and those claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that there be judgment in favor of Waffle House on Smothered Covered's claims for breach of contract, fraud, and LUTPA violations, and those claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Smothered Covered file a motion for attorney's fees and other costs, with all required supporting documentation, within 30 days of the date of this Order & Reasons and that Defendants file any opposition to same within 15 days thereafter, whereupon the Court will take this matter under submission on the papers and evidence presented.

New Orleans, Louisiana, this 17th day of June, 2025.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE