UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

SMOTHERED COVERED, L.L.C.                          CIVIL ACTION

VERSUS                                             NO. 22-5132

WH CAPITAL, L.L.C, *et al.*                        SECTION M (5)

## ORDER & REASONS

Before the Court is a motion filed by defendant WH Capital, L.L.C. ("WH Capital") for reconsideration, new trial, and to amend the judgment in connection with this Court's June 17, 2025 Findings of Fact & Conclusions of Law.[1] Plaintiff Smothered Covered, L.L.C. ("Smothered Covered") responds in opposition,[2] and WH Capital replies in further support of its motion.[3] Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons denying the motion.

## I. BACKGROUND

This case concerns a commercial real estate transaction gone awry.[4] The property at issue – 2924 and 2940 Elysian Fields Avenue, New Orleans, Louisiana (the "Elysian Fields Property") – operated as a Waffle House restaurant from June 11, 2013, until it was closed on March 31, 2020.[5] On August 9, 2021, Waffle House, Inc. ("Waffle House") and non-party Federated Historic Holdings, L.L.C. ("Federated"), Smothered Covered's predecessor-in-interest, entered into the original Real Estate Sales Agreement for Federated to buy the Elysian Fields Property and its

---

[1] R. Doc. 219 (citing R. Doc. 211).
[2] R. Doc. 259
[3] R. Doc. 268.
[4] A more complete recitation of the facts can be found in this Court's Findings of Fact & Conclusions of Law. R. Doc. 211; *Smothered Covered, L.L.C. v. WH Cap., L.L.C.*, 2025 WL 1697124 (E.D. La. June 17, 2025).
[5] R. Doc. 211 at 5; *Smothered Covered*, 2025 WL 1697124, at *2-3.

improvements and fixtures, which agreement was amended several times, including one amendment reflecting that WH Capital was the correct owner (seller) of the property (collectively, the "RESA").[6]

When the RESA was signed, Waffle House had not completed what it calls the "deidentification" process on the Elysian Fields Property, whereby a wholly-owned subsidiary of Waffle House (*viz.,* Lavista Equipment Supply, Inc.) removes items from the decommissioned building it deems to be its "equipment" used to operate the building as a Waffle House restaurant.[7] Before deidentification, the building on the Elysian Fields Property contained, among other items, globe light fixtures; stools bolted into the flooring; high, mid, and low bars or counters affixed to cabinetry; backbar counters; seating booths affixed to cabinetry; commercial kitchen sinks; and a commercial kitchen exhaust hood (collectively, the "Subject Items").[8]

Throughout all of its amendments, the RESA stated that it concerned the sale of "the real estate, including all improvements and fixtures thereon, together with all easements, rights of way, licenses, privileges, hereditaments, and appurtenances, if any, inuring to the benefit of such land, located in the State of Louisiana, County [*sic*] of Orleans, and more particularly described in Exhibit 'A', generally described with a municipal address of 2924 and 2940 Elysian Fields Avenue, New Orleans, LA 70122, containing the entirety of the improvements located on approximately 18,916 SF of land (the 'Property')."[9]  Section 10(g) of Exhibit B attached to the RESA defined "fixtures" to "include 'component parts' as the term is used in Louisiana law."[10] According to WH Capital, it did not agree, or intend, to sell any of its "equipment" (including the

---

[6] R. Doc. 211 at 12-17, 31-32; *Smothered Covered*, 2025 WL 1697124, at *6-9, *15-16.
[7] R. Doc. 211 at 8, 12; *Smothered Covered*, 2025 WL 1697124, at *4, 6.
[8] R. Doc. 211 at 13; *Smothered Covered*, 2025 WL 1697124, at *6.
[9] R. Doc. 211 at 12; *Smothered Covered*, 2025 WL 1697124, at *6.
[10] R. Doc. 211 at 12; *Smothered Covered*, 2025 WL 1697124, at *6.

2

Subject Items) as part of the sale of the Elysian Fields Property, which it urged in this litigation were not component parts of the building.[11]  Smothered Covered, on the other hand, believed that the Subject Items were fixtures or component parts that would be conveyed with the sale.[12]  At no time before the closing did WH Capital apprise Smothered Covered that it understood the term "equipment" to include the Subject Items.[13]

On February 1, 2022, WH Capital notified Federated that it was removing its "equipment" from the Elysian Fields Property.[14]  WH Capital removed the Subject Items from the Elysian Fields Property the next day.[15]  No representative of Federated inspected the property between February 2, 2022, and the close of the inspection period on February 14, 2022,[16] but Federated had inspected the property on August 17, 2021, and a potential lessee and contractors had done so in October and November 2021, when the Subject Items were in place.[17]

The RESA restricted Federated from using the Elysian Fields Property as a 24-hour "breakfast oriented" restaurant.[18]  It also included the following "as is, where is" clause:

> AS-IS, WHERE-IS CONDITION.  Buyer agrees that, at its cost, Buyer will perform such examinations and investigations of the Property and any improvements thereon, which examinations and investigations are deemed by Buyer in its sole judgment to be appropriate or prudent, prior to Closing and that Buyer will rely solely upon such examinations and investigations (if any) in purchasing the Property.  Buyer agrees that the following disclaimer shall be included in the Deed issued pursuant to this Agreement and shall survive Closing:
>
> *Notwithstanding anything to the contrary herein, it is expressly understood and agreed that, except for warranties of title as set forth in this Deed, Buyer is acquiring the Property "As Is" and "Where Is," and with all faults and defects, latent or otherwise, and that Seller has not made and does not make and will not make any representations or warranties, expressed or implied, with respect to the*

---

[11] R. Doc. 211 at 13; *Smothered Covered*, 2025 WL 1697124, at *6.
[12] R. Doc. 211 at 13; *Smothered Covered*, 2025 WL 1697124, at *6.
[13] R. Doc. 211 at 27; *Smothered Covered*, 2025 WL 1697124, at *13.
[14] R. Doc. 211 at 26-27; *Smothered Covered*, 2025 WL 1697124, at *13-14.
[15] R. Doc. 211 at 27-31; *Smothered Covered*, 2025 WL 1697124, at *14-15.
[16] R. Doc. 211 at 27; *Smothered Covered*, 2025 WL 1697124, at *14.
[17] R. Doc. 211 at 20-21; *Smothered Covered*, 2025 WL 1697124, at *10-11.
[18] R. Doc. 211 at 15; *Smothered Covered*, 2025 WL 1697124, at *7.

*quality, physical condition, zoning, governmental permits, availability or cost of utilities, environmental condition or contamination, expenses, value of the Property or any improvements thereon, the structural integrity, habitability or usefulness of any improvements on the Property, or any other matter or thing affecting or related to the Property or any improvements thereon (including without limitation, warranties of habitability, warranties of merchantability, and/or fitness for a particular purpose), which might be pertinent in considering whether to purchase the Property, and Buyer does hereby expressly acknowledge that no such representations or warranties have been made. Buyer further acknowledges and agrees that Seller shall not be liable or bound in any manner by any warranties, either expressed or implied, guarantees, promises, statements, representations, or information pertaining to the Property, or any improvements thereon, made or furnished by any broker, agent, employee, servant or other person representing or purporting to represent the Seller.*[19]

On March 15, 2022, Federated assigned and transferred to Smothered Covered, a related entity, its rights, title, and interest under the RESA.[20]  That same day, Smothered Covered asked WH Capital for access to inspect the property, but the access code provided did not work.[21]  On the next day, March 16, 2022, Smothered Covered and WH Capital closed on the sale with the execution of an act of cash sale."[22]  When Smothered Covered took possession of the Elysian Fields property, and accessed the building, it discovered that WH Capital had removed the Subject Items, *i.e.*, the items WH Capital labels "equipment" but which Smothered Covered considers "component parts."[23]

On November 3, 2022, Smothered Covered filed this suit in state court against Waffle House,[24] alleging that the removal of the Subject Items constituted a breach of contract, fraud, and violation of the Louisiana Unfair Trade Practices Act ("LUTPA").[25]  Waffle House removed the

---

[19] R. Doc. 211 at 14 (emphasis in original); *Smothered Covered*, 2025 WL 1697124, at *7.
[20] R. Doc. 211 at 35; *Smothered Covered*, 2025 WL 1697124, at *17.
[21] R. Doc. 211 at 33-34; *Smothered Covered*, 2025 WL 1697124, at *16-17.
[22] R. Doc. 211 at 35-37; *Smothered Covered*, 2025 WL 1697124, at *17-18.
[23] R. Doc. 211 at 27, 37; *Smothered Covered*, 2025 WL 1697124, at *14, *18.
[24] Smothered's claims against Waffle House were eventually dismissed with prejudice.  R. Doc. 211 at 41-42, 50-53; *Smothered Covered*, 2025 WL 1697124, at *20, *25-26.
[25] R. Doc. 1-1 at 4-6.

4

suit to this Court, invoking diversity subject-matter jurisdiction pursuant to 28 U.S.C. § 1332.[26] Smothered Covered then filed an amended complaint, adding WH Capital as a defendant and asserting the same claims.[27]

The matter was tried before the Court, sitting without a jury, over five days.[28]   After considering the evidence admitted at trial, the arguments and submissions of counsel, and the applicable law, the Court issued its Findings of Fact & Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.[29]   The Court held that the Subject Items were component parts of the building under Louisiana Civil Code article 466 and, consequently, that WH Capital breached the RESA and the act of cash sale by delivering the Elysian Fields Property without the Subject Items.[30]   In so holding, the Court found that the "as is, where is" clause applied only to redhibitory defects and did not relieve WH Capital of the obligation to deliver the immovable property to its full extent, albeit only in its existing condition.[31]   The Court awarded to Smothered Covered damages in the total amount of $167,295.31, consisting of $126,272.43 to replace the Subject Items at their current market price and $41,022.88 to repair the damage to the building caused by their removal.[32]   However, the Court denied Smothered Covered's claim for lost profits, finding it to be too speculative, and dismissed with prejudice Smothered Covered's fraud and LUTPA claims.[33]   Finally, the Court awarded to Smothered Covered attorney's fees, expert witness fees, fees for other professional services, and court costs, as provided by contract, in amounts to be set on post-trial motions.[34]

---

[26] R. Doc. 1 at 1.
[27] R. Doc. 14 at 1-6.
[28] R. Doc. 211 at 1; *Smothered Covered*, 2025 WL 1697124, at *1.
[29] R. Doc. 211 at 1; *Smothered Covered*, 2025 WL 1697124, at *1.
[30] R. Doc. 211 at 41-50; *Smothered Covered*, 2025 WL 1697124, at *20-25.
[31] R. Doc. 211 at 47-48; *Smothered Covered*, 2025 WL 1697124, at *24.
[32] R. Doc. 211 at 53-60; *Smothered Covered*, 2025 WL 1697124, at *26-29.
[33] R. Doc. 211 at 50-53, 60-61; *Smothered Covered*, 2025 WL 1697124, at *25-26, *29-30.
[34] R. Doc. 211 at 61; *Smothered Covered*, 2025 WL 1697124, at *30.

WH Capital now moves for reconsideration or a new trial, arguing that the Court's Findings of Fact & Conclusions of Law contain multiple errors.[35]  Specifically, WH Capital argues that: (1) awarding replacement costs for the Subject Items as damages placed Smothered Covered in a materially superior position than it would have been in had the Subject Items not been removed; (2) Smothered Covered cannot recover breach-of-contract damages against WH Capital because the property's market value on the date of the sale exceeded the purchase price; (3) the removal of the kitchen vent hood on February 2, 2022, did not cause any water intrusion or other damage to any ceiling tiles, the electrical system, or any fluorescent lights; (4) due to the "as is, where is" clause, Smothered Covered does not have an actionable breach-of-contract claim against WH Capital for removal of the Subject Items; (5) the Subject Items were not component parts and their removal did not cause any substantial damage to the building; and (6) Federated and Smothered Covered failed to take reasonable steps before the expiration of the inspection period on February 14, 2022, to mitigate any damages.[36]

## II.    LAW & ANALYSIS

### A.  Legal Standard

Because a judgment has not been entered in this case, the June 17, 2025 Findings of Fact & Conclusions of Law constitutes an interlocutory order the reconsideration of which is governed by Rule 54(b) of the Federal Rules of Civil Procedure.  *See AIG Specialty Ins. Co. v. Agee*, 2025 WL 655069, at *4 (5th Cir. Feb. 28, 2025) (observing that Rule 54(b) permits a district court, after a bench trial, to reconsider its findings of fact and conclusions of law filed before judgment was entered).  Under Rule 54(b), a "court is free to reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification

---

[35] R. Doc. 219.
[36] R. Doc. 219-2 at 3-25.

of the substantive law." *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 336 (5th Cir. 2017) (quotation omitted). Rule 54(b) "'reflect[s] the inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires.'" *Id.* at 337 (internal quotation marks omitted) (quoting *Cobell v. Jewell*, 802 F.3d 12, 25 (D.C. Cir. 2015)) However, the district court must exercise this broad discretion sparingly to forestall the perpetual reexamination of orders and the resulting burdens and delays. *See Calpecto 1981 v. Marshall Expl., Inc.*, 989 F.2d 1408, 1415 (5th Cir. 1993) (observing that if "the district court was required to reconsider [an interlocutory order] simply because [the losing party] belatedly came forward with evidence not submitted prior to the ruling[,] ... the cycle of reconsideration would be never-ending"); *Domain Prot., LLC v. Sea Wasp, LLC*, 2019 WL 3933614, at *5 (E.D. Tex. Aug. 20, 2019) ("[A]lthough a district court may revisit an interlocutory order on any ground it sees fit, it may also use its discretion to prevent parties from, without justification, raising new arguments for the first time.") (emphasis, alteration, and quotation omitted); 18B CHARLES A. WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4478.1, at 659 (3d ed. 2019) ("A trial court could not operate if it were to yield to every request to reconsider each of the multitude of rulings that may be made between filing and final judgment.").[37]

---

[37] WH Capital also moves for a new trial under Rule 59(a) of the Federal Rules of Civil Procedure. However, Rule 59(a), and its bench-trial specific counterpart, Rule 52(b), apply to judgments. Rule 52(b) provides that, after a bench trial, "[o]n a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings – or make additional findings – and may amend the *judgment* accordingly." Fed. R. Civ. P. 52(b) (emphasis added). A Rule 52(b) motion "may accompany a motion for a new trial under Rule 59." *Id.* Similarly, Rule 59(a)(2) states that "[a]fter a nonjury trial, the court may, on motion for a new trial, open the *judgment* if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a) (emphasis added). Rule 59(e) specifies that "[a] motion to alter or amend a *judgment* must be filed no later than 28 days after the entry of the *judgment*." Fed. R. Civ. P. 59(e) (emphasis added). Courts apply the same standard to both Rule 52(b) and Rule 59 motions. *Interstate Fire & Cas. Co. v. Cath. Diocese of El Paso*, 622 F. App'x 418, 420 (5th Cir. 2015). Motions under Rules 52(b) and 59 call into question the correctness of a *judgment*. *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002). Such rules are "properly invoked to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* (quotation omitted). When the motion is not based on newly discovered evidence, the movant "must clearly establish a manifest error of law or fact." *Interstate Fire*, 622 F. App'x at 420 (quotation omitted). "Manifest error is one that is plain and indisputable, and that amounts to a complete disregard of the controlling law." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir.

### B. Analysis

The Court will evaluate in turn each ground upon which WH Capital seeks reconsideration or a new trial.

### 1. Awarding replacement costs for the Subject Items

WH Capital argues that the Court erred by awarding as damages the replacement costs for the Subject Items because that award placed Smothered Covered in a materially superior position than it would have been in had the Subject Items not been removed from the building.[38]  According to WH Capital, the Court should have evaluated Smothered Covered's damages by comparing the Elysian Fields Property's market value at the time of the sale (which WH Capital says was $340,000-$360,000) to its purchase price ($330,000), thus yielding no damage, instead of awarding the replacement costs of the Subject Items.[39]  In addition, as to the award made, which was based on the testimony of Smothered Covered's expert Robbie Poche, WH Capital contends that the Court erred in awarding damages based on contemporaneous replacement costs that did not account for depreciation, considering that the Subject Items had been in nearly continuous use for nine years prior to their removal.[40]

In opposition, Smothered Covered points out that WH Capital, in its proposed findings of fact and conclusions of law, argued that replacement cost is one of the three acceptable measures of damages for property damage and it cannot have been legally erroneous for the Court to employ

---

2004) (quotation omitted).  Consequently, "[a] Rule 59(e) motion should not be used to relitigate prior matters that should have been urged earlier or that simply have been resolved to the movant's dissatisfaction." *In re Self*, 172 F. Supp. 2d 813, 816 (W.D. La. 2001).  The grant of such a motion is an "extraordinary remedy that should be used sparingly." *Indep. Coca-Cola Emps. Union of Lake Charles, No. 1060 v. Coca-Cola Bottling Co. United, Inc.*, 114 F. App'x 137, 143 (5th Cir. 2004).  A district court has considerable discretion to grant or deny a Rule 59(e) motion. *See Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 353 (5th Cir. 1990).

[38] R. Doc. 219-2 at 3-6.
[39] *Id.* at 3-4.
[40] *Id.* at 4-6.

a damages calculation suggested as viable by WH Capital.[41]  Smothered Covered further argues that WH Capital cites in its motion only cases that support its preferred damages calculation – the difference in the market value and the sale price – but that those cases involved construction defects, not the removal of component parts.[42]  Moreover, says Smothered Covered, the Court's decision not to consider depreciation was factually supported by WH Capital's admission that the Subject Items are not available in used condition on the open market, making Smothered Covered's only option to buy comparable new items.[43]

WH Capital replies, arguing that Smothered Covered does not cite any cases supporting its contention that it is entitled to recover the replacement cost of the Subject Items without accounting for depreciation.[44]  Instead, says WH Capital, Smothered Covered's damages should have been capped at the cost of comparable used items.[45]  Moreover, WH Capital argues that the Court failed to account for the $10,000 reduction in the purchase price that Federated agreed to on February 11, 2022.[46]

In the Findings of Fact & Conclusions of Law, this Court expressly noted that WH Capital identified three acceptable methods of calculating damages to property under Louisiana law: (1) restoration costs, if the damaged item can be adequately repaired; (2) the difference in the Elysian Fields Property's value before and after the damage; or (3) if the value before and after the damage cannot reasonably be determined or the cost of repairs exceeds the value of the thing damaged, the cost to replace new, less reasonable depreciation.[47]  The Court noted further that WH Capital preferred the second method – the before-and-after valuation – and then it evaluated the evidence

---

[41] R. Doc. 259 at 4.
[42] *Id.*
[43] *Id.* at 4-5.
[44] R. Doc. 268 at 1.
[45] *Id.* at 1-2.
[46] *Id.* at 2.
[47] R. Doc. 211 at 55; *Smothered Covered*, 2025 WL 1697124, at *27.

WH Capital presented as to the valuations.[48]  In doing so, the Court found that the testimony of Wesley Moore, WH Capital's expert on valuation, was not "compelling since it has more the character of anecdote, a guess, or, at best, a very rough estimate, than the kind of substantiated damage model the law requires."[49]  Because WH Capital did not present competent evidence of the before-and-after valuation, the Court found that the first approach – cost of restoration – was the most appropriate measure of Smothered Covered's damages, as the property could be repaired and the cost of repairs did not exceed the value of the property.[50]  The Court specifically did not employ the third approach – replacement cost, less reasonable depreciation – because the conditions for doing so were not present.[51]  Thus, there was no need to account for depreciation. To that end, the Court found that the cost of restoration was what it would take for Smothered Covered to refit the property to market it to third parties as a second-generation restaurant – which was Smothered Covered's avowed objective in acquiring the Elysian Fields Property.[52]  The Subject Items WH Capital had its wholly-owned subsidiary (Lavista) remove from the property are not available on the open market but are only made available to other Waffle House restaurants. Consequently, the best evidence of the cost of restoration to refit the Elysian Fields Property as a restaurant was Poche's testimony.[53]  Smothered Covered did not receive a windfall, but rather the amount to reimburse it for the expense it would have necessarily incurred to restore the property to the position it would have been in had the Subject Items not been removed.  *See, e.g., Pierron v. Kimpton*, 415 So. 3d 414, 434-37 (La. App. 2025) (upholding property damage award based on cost of restoration, without depreciation); *Roman Cath. Church of the Archdiocese of New Orleans*

---

[48] R. Doc. 211 at 55-56; *Smothered Covered*, 2025 WL 1697124, at *27.
[49] R. Doc. 211 at 56; *Smothered Covered*, 2025 WL 1697124, at *27.
[50] R. Doc. 211 at 56; *Smothered Covered*, 2025 WL 1697124, at *27.
[51] R. Doc. 211 at 56; *Smothered Covered*, 2025 WL 1697124, at *27.
[52] R. Doc. 211 at 56; *Smothered Covered*, 2025 WL 1697124, at *27
[53] R. Doc. 211 at 56-57; *Smothered Covered*, 2025 WL 1697124, at *27-28.

*v. La. Gas Serv. Co.*, 618 So. 2d 874, 879-80 (La. 1993) (allowing award for full cost of restoration where more limited award would not facilitate plaintiff's objective in acquiring the property). Finally, the $10,000 reduction in the purchase price had nothing to do with the removal of the Subject Items, but instead was to account for damage identified in the October and November 2021 inspections, as well as the post-inspection thefts.[54]  After all, WH Capital's removal of the Subject Items occurred well after these events *and the extent of their removal was undisclosed* to Smothered Covered when it executed the RESA amendment reducing the purchase price.

### 2. Recovery of breach-of-contract damages

Next, WH Capital contends that Smothered Covered cannot recover any breach-of-contract damages against WH Capital because the market value of the Elysian Fields Property on the date of the sale exceeded the purchase price.[55]  According to WH Capital, because there was no fraud shown, the Court improperly relied on tort principles to award restoration costs, when it should have set the breach-of-contract damages as the difference in the market value and purchase price.[56]  Moreover, says WH Capital, no amount is due because the property was worth more on the date of sale ($340,000 to $360,000) than what Smothered Covered paid for it ($330,000).[57]

In opposition, Smothered Covered argues that there was no legal error in the Court's damages award because this case does not involve defects in the thing sold (redhibition), but rather the seller's failure to deliver the thing promised.[58]  Smothered Covered points out that WH Capital does not explain why the Court erred in rejecting the market-value approach to damages and focusing on the value of the items WH Capital sold but failed to deliver.[59]

---

[54] R. Doc. 211 at 32; *Smothered Covered*, 2025 WL 1697124, at *16.
[55] R. Doc. 219-2 at 3-11.
[56] *Id.*
[57] *Id.*
[58] R. Doc. 259 at 5-6.
[59] *Id.*

WH Capital replies, reasserting that the Court improperly awarded damages based on tort principles and placed Smothered Covered in a better position than it would have been in had the contract not been breached.[60]    Again, WH Capital repeats that Smothered Covered should have been placed in the position it would have been in without the breach, "that is, with nine-year-old Subject Items that had been used 24/7 while the restaurant was operating."[61]

This assignment of error is an offshoot of the first one – namely, that the Court applied an improper measure of damages.  The Court will again remind WH Capital that it was the party that cited *Carter v. Gulf States Utilities Co*., 454 So. 2d 817 (La. App. 1984), as authority for the three methods courts use to assess damages associated with property damage.[62]  And property damage is exactly what WH Capital's breach of the contract caused.  WH Capital damaged the Elysian Fields Property when it removed the Subject Items, which were component parts of the building, thus delivering to Smothered Covered a mere shell of the building it contracted to buy.  The Court considered all three potential methods for calculating the damages and determined that, based on the evidence presented at trial, the cost of restoration was the proper method to make Smothered Covered whole.  The before-and-after valuation method would have left Smothered Covered with no redress for WH Capital's wrong, and the replacement cost method would not have provided enough recovery to enable Smothered Covered to reoutfit the space as a second-generation restaurant – which was its objective in acquiring the property.  There was no error in this respect.

Moreover, because the measure of damages in a breach-of-contract case is governed by the contract, and because the RESA provides that WH Capital's breach of its obligation, as seller, not to "alienate … any portion of the [Elysian Fields] Property," including by its removal of the

---

[60] R. Doc. 268 at 2-3.
[61] *Id.*
[62] R. Doc. 211 at 55; *Smothered Covered*, 2025 WL 1697124, at *27.

Subject Items, "shall be a default by the Seller for which Buyer shall have the rights described in this Agreement," including the right to "demand specific performance of Seller's obligation under this Agreement," Smothered Covered is entitled to this remedy.[63]  Under Louisiana law, "[i]f specific performance is impracticable, the court may allow damages to the obligee." La. Civ. Code art. 1986.  As the 1984 revision comments to article 1986 explain, this means that "if an obligor fails to perform an obligation *to deliver a thing*, the court shall grant specific performance to the obligee," but "the court may allow damages to the obligee instead of specific performance if the latter is impracticable, as when the obligation is *to deliver a thing* and the obligor … has destroyed the thing." *Id.* revision cmt. (b) to 1984 amend. (emphasis added).  "Damages are measured by the loss sustained," La. Civ. Code art. 1995, and "[t]he measure of damages can include an 'additional expense' that an obligee incurs because of the obligor's breach." *IberiaBank v. Broussard*, 907 F.3d 826, 836 (5th Cir. 2018) (quoting *Swoboda v. SMT Props., L.L.C.*, 975 So. 2d 691, 695 (La. App. 2008)).  The loss sustained by Smothered Covered is the value of the Subject Items removed by WH Capital in breach of its contracts with Smothered Covered, and, under the RESA and act of cash sale, as informed by the Louisiana Civil Code, there is no principled reason in this case why that value cannot be measured using one of the methods courts use to assess damages associated with property damage – specifically, the one best suited to redress the breach of contract here, *i.e.*, the restoration cost method.

For similar reasons, the Louisiana supreme court in *Corbello v. Iowa Production*, 850 So. 2d 686 (La. 2003), rejected as without merit an oil company's argument that the plaintiffs' damages award should be tethered to the market value of the property.  *Id.* at 695.  As the court explained: "To do so would give license to oil companies to perform its operations [*i.e.*, contracted

---

[63] Trial Ex. 1 at 6, 17.

obligations] in any manner, with indifference as to the aftermath of its operations because of the assurance that it would not be responsible for the full cost of restoration." *Id.* In so holding, the *Corbello* court rejected the damages limitation that sometimes governs in tort cases, but it did not reject the notion that the three traditional methods courts use to measure property damages can be employed in breach-of-contract cases. To be sure, the Louisiana supreme court went on to hold that the award of restoration costs was reasonable, observing that "[t]he adequacy of the award should be determined [in the exercise of much discretion by the trier of fact] by facts or circumstances particular to the case under consideration." *Id.* at 696. While *Corbello* is not on all fours with this case,[64] it provides guideposts to the appropriate measure of damages in a breach-of-contract case where the "loss sustained" involves damage to property and calls for the application of restoration damages.

### 3. Damage caused by removal of the vent hood

Third, WH Capital argues that the Court erred in awarding Smothered Covered $41,022.88 for damage caused by the removal of the vent hood because, says WH Capital, the removal of the vent hood did not cause any water intrusion or any other damage to any ceiling tiles, the electrical system, or any fluorescent lights.[65] WH Capital contends that Smothered Covered presented no evidence at trial that the damage occurred after the vent hood was removed in February 2022, because no representative of Smothered Covered or Federated visited the Elysian Fields Property between early November 2021 and March 23, 2022.[66] Consequently, continues WH Capital,

---

[64] Thus, *Corbello* may be distinguished as involving a contract that contained a specific restoration obligation, whereas the contracts at issue here do not. The significance of the distinction fades, however, once the pertinent contractual language is parsed (as above) to understand that the breach of WH Capital's obligation "to deliver the thing" sold as giving rise to a remedy of restoration damages for breach of contract. So understood, the relevance of the reasoning of the *Corbello* court with respect to the appropriate way of measuring and determining damages is made plain.

[65] R. Doc. 219-2 at 11-14.

[66] *Id.*

14

Smothered Covered has no proof of when, where, how, or to what extent any water intrusion occurred or caused water-related damage to the ceiling tiles, electrical systems, or fluorescent lights.[67]  WH Capital argues further that Smothered Covered's representatives conceded during their trial testimony that, by November 2021, Federated knew from an inspection report that the Elysian Fields Property had sustained damage as a result of theft, vandalism, and Hurricane Ida.[68] Moreover, WH Capital contends that photographic evidence introduced at trial shows that there was a different source of water intrusion that was not caused by the removal of the vent hood.[69] In sum, WH Capital concludes that this Court improperly relied on the speculation of Smothered Covered's representatives that the interior water damage was caused by roof penetrations attributable to the removal of the vent hood.[70]

In opposition, Smothered Covered contends that WH Capital's argument on this point "is nothing more than a difference of opinion as to the persuasiveness and weight of evidence presented at trial," which is not a basis upon which to modify the Court's factual findings.[71]

WH Capital replies, reasserting its position that the evidence and testimony at trial do not support a finding that the removal of the vent hood caused additional water-intrusion damage to the building.[72]  WH Capital reurges that the water damage was caused by Hurricane Ida, vandalism, and a defective and leaky roof and that there is no evidence or testimony that any ceiling tiles or electrical systems were located near the area where the vent hood was removed.[73]

After carefully evaluating all of the testimony and evidence adduced at trial, the Court credited the testimony of Jacobson and Kazanoff, as well as the photographic evidence showing

---

[67] *Id.*
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] R. Doc. 259 at 6-7.
[72] R. Doc. 268 at 3-5.
[73] *Id.*

the condition of the Elysian Fields Property before and after the Subject Items (including the kitchen exhaust hood) were removed, to conclude that the removal of the Subject Items caused damage to the building.[74]   The damage caused by the thefts, vandalism, and hurricane was documented in the inspections of October and November 2021 and the associated reports, and the $41,022.88 awarded "[t]o repair the ceiling damage caused by the removal of the Subject Items," which repairs included evaluation of the electrical system, and replacement of the ceiling and light fixtures, was not definitively tied to the pre-November 2021 events.   Nor did WH Capital prove that this damage was caused by any other act, meaning that the Court did not err in accepting Jacobson and Kazanoff's testimony attributing the cause of the damage to the removal of the Subject Items, including, but not limited to, removal of the exhaust hood.   WH Capital simply disagrees with this Court's interpretation of the evidence.   In its motion for reconsideration, WH Capital does not point to any evidence that this Court did not already consider in rendering its findings of fact on this score.   Such a difference of opinion is not a basis upon which this Court will upset its previously rendered findings of fact.

### 4.   The effect of the "as is, where is" clause

Fourth, WH Capital contends that, due to the "as is, where is" clause, Smothered Covered does not have an actionable breach-of-contract claim against it for removal of the Subject Items.[75] Specifically, WH Capital argues that the Court erred in cabining the "as is, where is" clause to redhibitory defects, when, in its view, the clause is much broader, and "when read alongside the inspection period provision, is intended to ensure that the buyer accepts the property in the condition it was in at the time of the Cash Sale."[76]   WH Capital further argues that Federated, and

---

[74] R. Doc. 211 at 30; *Smothered Covered*, 2025 WL 1697124, at *15.
[75] R. Doc. 219-2 at 14-18.
[76] *Id.* at 17.

Smothered Covered by extension, could and should have exercised their inspection right and rescinded the RESA had they been dissatisfied with the condition of the Elysian Fields Property after the removal of the Subject Items.[77]

In opposition, Smothered Covered argues that WH Capital is rehashing an argument that this Court has already rejected.[78]  Smothered Covered explains that none of the cases upon which WH Capital relies to support its expansive reading of the "as is, where is" clause dealt with the situation at hand in this case – namely, "when the seller delivers to the buyer a thing *different from what was originally promised.*"[79]  Instead, Smothered Covered explains that WH Capital's cases involved claimed defects in what was sold, not "the delivery of a different thing."[80]

WH Capital replies, arguing that the cases it cites demonstrate that a broadly worded "as is, where is" clause can be extended to include all sorts of different scenarios, including the one at issue here.[81]  It also asserts that Smothered Covered has not cited any cases that prohibit the application of the "as is, where is" clause to "circumstances where the [b]uyer was advised that damage, looting and theft had occurred and that equipment and appurtenances had been removed, no later than 15 days prior to February 14, 2022, the date on which the inspection period ended, without [Smothered Covered] having exercise[ed] that right since November 2021."[82]

After thoroughly and carefully considering the arguments made by both sides in post-trial briefs directed to the issue,[83] this Court concluded that, under the facts of this case, the "as is, where is" clause applies only to redhibitory defects because "any different conclusion would allow a seller to use an 'as is, where is' clause as a basis to unilaterally change, by the physical removal

---

[77] *Id.*
[78] R. Doc. 259 at 7-8.
[79] *Id.* at 7 (emphasis in original).
[80] *Id.* at 8.
[81] R. Doc. 268 at 5-6.
[82] *Id.* at 6.
[83] *See* R. Docs. 202; 206.

of items or otherwise, the composition of the very thing (the contract's object) it has contracted to deliver."[84]  This Court further found that WH Capital's "argument regarding the 'as is, where is' clause is without merit, because this is not a case involving a defect in the thing delivered, but the delivery of a different thing."[85]  WH Capital's motion for reconsideration, even though it largely rehashes arguments already considered, has not changed the Court's core opinion on this point, but it does cause the Court to alter slightly how it frames its opinion.  Thus, taking into account the non-redhibition cases WH Capital cites, the Court now believes that its conclusion that "the waiver embodied in the 'as is, where is' clause 'only applies to redhibitory defects'" is too narrow. Instead, the clause should be read to apply to any kind of case involving defects in the thing sold. But even this slightly broader reading of the clause does not help WH Capital here.   The Court simply cannot apply the "as is, where is" clause to allow WH Capital to escape its obligation to deliver the thing it sold to Smothered Covered – that is, the Elysian Fields Property and its component parts, which included the Subject Items.  WH Capital's stilted reading of the inspection clause does not change this result.  This is because Federated (as predecessor to Smothered Covered) did exercise its right of inspection to view the property before the closing, just not when WH Capital says it should have.  The "as is, where is" provision does not work in tandem with the inspection clause to require the buyer to continually inspect the property up to the closing date, lest the seller seek to fundamentally alter the thing sold after the buyer has inspected it. Hypothetically, WH Capital's reading would allow the seller of a residential property to remove the house itself under the guise of an "as is, where is" provision the day after the buyer inspects the property so long as it does so before the closing with time left in the inspection period.  That is not what the parties intended.

---

[84] R. Doc. 211 at 47-48 (quote at 48); *Smothered Covered*, 2025 WL 1697124, at *24.
[85] *Id.*

### 5.    The Subject Items as component parts

Fifth, WH Capital contends that the Subject Items were not component parts of the building and their removal did not cause substantial damage to the building.[86]  WH Capital argues that the Court improperly relied on Jacobson's testimony and photographs taken after the building's electricity was turned off to conclude that the removal of the Subject Items caused substantial damage to the building.[87]  Instead, says WH Capital, the Court should have given more weight to the testimony of its witness, Kirk Bodenheimer, and the photographs he took closer in time to the removal of the Subject Items to conclude that minimal damage, if any, was caused to the building by their removal.[88]

In opposition, Smothered Covered argues that WH Capital is again recycling arguments that the Court has already considered and rejected.[89]  Smothered Covered also asserts that WH Capital does not identify new evidence but merely points to a difference of opinion on how to interpret the competing evidence, which, says Smothered Covered, does not warrant reconsideration.[90]  Smothered Covered then focuses attention on the Court's alternative holding that the Subject Items were component parts under the second paragraph of Louisiana Civil Code article 466, which pertains to things (*i.e.*, the Subject Items) attached to an "other construction" (*i.e.*, the restaurant building) that serve its principal purpose (*i.e.*, as a restaurant), and observes that WH Capital does not ever address that holding.[91]

WH Capital replies, arguing that the Court improperly discounted Bodenheimer's testimony that the removal of the Subject Items did not cause substantial damage, considering that

---

[86] R. Doc. 219-2 at 18-22.
[87] *Id.*
[88] *Id.*
[89] R. Doc. 259 at 8-10.
[90] *Id.*
[91] *Id.*

he was the only witness who had personal knowledge of their removal.[92]  WH Capital also contends that the Court failed to consider that the building sustained damage from theft, burglary, and weather, and that Smothered Covered's witnesses could not differentiate between that damage and any caused by the removal of the Subject Items.[93]  Further, WH Capital contends that the Court legally erred in applying the second paragraph of article 466 because, says WH Capital, that paragraph refers to other constructions outside of the building, not items inside of it.[94]  According to WH Capital, the Court improperly conflated the "specific commercial purpose" provision with the "other construction clause" and should have considered the building as simply a general usage commercial building, and not a restaurant.[95]

Once again, WH Capital rehashes a difference of opinion between the parties in how to interpret the evidence regarding substantial damage caused by the removal of the Subject Items. The Court considered all the evidence presented at trial – exhibits and testimony – and determined that, in its view, the removal of the Subject Items in fact caused substantial damage to the building, which made them component parts under paragraph 3 of article 466.[96]  There was ample evidence (including photographic evidence) for this conclusion.  The Court weighed the competing evidence, including the testimony of Bodenheimer who supervised the removal of the Subject Items and had every interest to downplay any damage in order to protect the future of his work for WH Capital, and the testimony of Kazanoff and Jacobson who also viewed the property firsthand and saw for themselves the damage occasioned by removal of the Subject Items.  Considering this testimony alongside the photographic evidence, the Court found that removal of the Subject Items

---

[92] R. Doc. 268 at 6-7.
[93] *Id.* at 6.
[94] *Id.* at 6-7.
[95] *Id.*
[96] R. Doc. 211 at 43-46; *Smothered Covered*, 2025 WL 1697124, at *21-23.

caused substantial damage to the building.  The Court will not reverse course – especially since WH Capital has identified no new evidence in this regard.  As to the interpretation of paragraph 2 of article 466, the Court properly determined that, in the RESA, the parties defined "building" to include "other constructions" for purposes of article 466, making the terms interchangeable, and thus bringing the second paragraph of article 466 into play because the Subject Items were part of what served the principal purpose of the building on the Elysian Fields Property as a restaurant.[97] Moreover, it makes sense that the parties considered the Subject Items to be component parts and the building to be a restaurant because the RESA expressly prohibited Smothered Covered from using it as a breakfast-type restaurant, but not as any other kind of restaurant.[98]  Under either paragraph of article 466, then, the Subject Items were component parts.

### 6.  Inspection

Lastly, WH Capital argues that Smothered Covered should be prohibited from recovering any damages because both Federated and Smothered Covered failed to take reasonable steps before the expiration of the inspection period on February 14, 2022, to avoid and mitigate against any damages.[99]  Specifically, WH Capital faults Smothered Covered, and its predecessor-in-interest Federated, for failing to conduct an inspection of the Elysian Fields Property after WH Capital informed them of the thefts and of WH Capital's prospective removal of its equipment from the building.[100]  WH Capital contends that a prudent buyer would have conducted such an inspection, or at least asked what had been removed, if the Subject Items had been so important to the sale.[101]

---

[97] R. Doc. 211 at 46-47; *Smothered Covered*, 2025 WL 1697124, at *23.
[98] R. Doc. 211 at 47; *Smothered Covered*, 2025 WL 1697124, at *24.
[99] R. Doc. 219-2 at 22-25.
[100] *Id.*
[101] *Id.*

In opposition, Smothered Covered argues that it had no reason to believe that the Subject Items would have been removed either as part of the thefts or by WH Capital because they were component parts of the building and WH Capital said only that its "equipment" would be removed.[102] Smothered Covered repeats that WH Capital is again asking for a reinterpretation of the evidence and reexamination of previously rejected arguments.[103]

WH Capital replies, stating that Smothered Covered has not provided any rebuttal to the fact that it failed to mitigate its damages by not conducting a timely inspection before proceeding with the sale.[104]

Federated's representatives first inspected the property in August 2021 pursuant to the right it had under the RESA to do so.[105] And it had its contractors inspect the property as late as November 2021 to report its condition.[106] Yet, WH Capital again argues that Smothered Covered forfeited any right to recover damages because it did not inspect the property when WH Capital says it should have done. In its Findings of Fact & Conclusions of Law, the Court found that the communications between the parties about the thefts in January of 2022 gave Federated no reason to believe that any of the building's component parts (*i.e.*, the Subject Items) had been stolen.[107] And this Court found that WH Capital's email informing Smothered Covered that it was removing its "equipment" "did not (and could not of itself) alter WH Capital's obligations under the Elysian Fields RESA and act of cash sale to deliver the entirety of the thing it … had contracted to deliver," which was the property and its component parts, including the Subject Items.[108] Nonetheless, WH Capital again asks this Court to endorse a scenario where a seller can remove component parts of

---

[102] R. Doc. 259 at 10-11.
[103] *Id.*
[104] R. Doc. 268 at 7-8.
[105] R. Doc. 211 at 19-20; *Smothered Covered*, 2025 WL 1697124, at *10.
[106] R. Doc. 211 at 21-22; *Smothered Covered*, 2025 WL 1697124, at *11.
[107] R. Doc. 211 at 25-26; *Smothered Covered*, 2025 WL 1697124, at *12-13.
[108] R. Doc. 211 at 49; *Smothered Covered*, 2025 WL 1697124, at *25.

the building and get away with delivering less that what it promised to deliver if the buyer does not continually inspect the property up to the end of the inspection period so as to catch the seller in the act of removal. The Court will not countenance such an untenable and strained reading of the inspection clause.

## III.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that WH Capital's motion for reconsideration and new trial regarding this Court's June 17, 2025 Findings of Fact & Conclusions of Law (R. Doc. 219) is DENIED.

New Orleans, Louisiana, this 7th day of October, 2025.

BARRY W. ASHE
UNITED STATES DISTRICT JUDGE